COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-05-237-CR

 

 

KIM STEVENS                                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE 235TH DISTRICT COURT OF COOKE COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction








Appellant Kim Stevens appeals her conviction and
life sentence for the offense of capital murder.  Stevens argues in four points that the
evidence is factually insufficient to support her conviction, that the trial court
erred by allowing an adult witness to testify by two-way closed circuit
television, that the trial court erred by allowing a social worker to give
hearsay testimony that did not in fact fall within the
medical-diagnosis-or-treatment exception to the hearsay rule, and that the
trial court violated Stevens=s due process rights by excluding testimony that she claims was vital
to her defense.  We will affirm.

II.  Brief Factual Background

During the afternoon of January 4, 2000, Stevens
took Jorden Saager, a two-and-a-half-year-old girl whom she was babysitting, to
the doctor.  The nurses at the doctor=s office rushed Jorden back to a room at the doctor=s office and shortly thereafter called 911.  An ambulance arrived and took Jorden to the
hospital, where doctors pronounced her dead approximately twenty minutes
later.  

The autopsy revealed that Jorden had a fairly
recent fracture that was four to five inches long on the back left part of her
skull, that her duodenum had been transected such that the two ends of Jorden=s bowel were completely torn apart, and that she had bruises all over
her body.  The medical examiner who
performed Jorden=s autopsy
stated that death was caused by shock and sepsis as a result of the separation
of the bowel and that the head injury could have contributed to Jorden=s death.  A jury convicted
Stevens of murder for causing Jorden=s death, and this appeal followed.

III.  Factually Sufficient
Evidence To Support Capital Murder Conviction








In her fourth point, Stevens contends that the
evidence is factually insufficient to support her conviction for capital
murder.  Specifically, Stevens argues
that there was almost no evidence of her guilt; she argues that there was
evidence only of a homicide and that both she and Jorden=s parents had the opportunity to commit the crime.  Thus, she argues that the jury was forced to
choose between herself and Jorden=s parents as the perpetrator of the offense.  Because the jury=s verdict is based primarily on circumstantial evidence and because
Stevens told numerous people slightly different stories about the events that
transpired on January 4, 2000, we set forth an extremely detailed summary of
the facts below.

A.     Standard of Review








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the fact-finder=s determination is clearly wrong and manifestly unjust or whether
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s determination is manifestly unjust.  Watson, 204 S.W.3d at 414-15, 417; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.

In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@ Johnson, 23 S.W.3d at 8. 
Thus, we must give due deference to the fact-finder=s determinations, Aparticularly those determinations concerning the weight and
credibility of the evidence.@  Id. at 9.








An opinion addressing factual sufficiency must include a discussion of
the most important and relevant evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).         B.     The Evidence[1]

1.     The Facts Concerning The Events Leading Up
To Jorden=s
Death 

 

a.      General Background

Yolanda and Lloyd Saager met while they were both
in the Army and married.  At the time of
the trial, they had been married for eleven years.  Their children are Branden, who was born in
1994; Alyssa, who was born in 1996; and Jorden who was born in 1997.  Yolanda was discharged from the Army after
she gave birth to Branden and stayed home to raise the children.  When Lloyd was discharged from the Army in
July 1999, he was offered a job as a field service technician for Remstar in
Plano, and the family decided to move in with Yolanda=s AGrandpa,@ Clyde Ward,[2]
in Gainesville until they could find a place to live.  








Stevens lived next door to Ward with her three
children.  Yolanda met Stevens in August
or September of 1999.  While their
children played together, Yolanda got to know Stevens and felt that she could
trust her.  

In the fall of 1999, Lloyd and Yolanda noticed
that Jorden started having health issues.[3]  They thought that she was developing
allergies and petechiae because she had an ear infection and little red dots on
her hands.  Yolanda was concerned about
Jorden because Yolanda=s
grandmother had been diagnosed with a bleeding condition during the preceding
year, and petechiae was one of the symptoms. 
Yolanda took Jorden to Dr. Gibbs, who gave Jorden antibiotics to clear
up the ear infection and the petechiae. 

b.     Stevens Becomes Babysitter
for Saagers

Later that fall, Yolanda obtained a job as a
phlebotomist with LabCorp.  Prior to
starting this job, Yolanda talked with Stevens about not having child care, and
Stevens agreed to take care of Yolanda=s children while Yolanda worked. 
Stevens told Yolanda that she was a pharmacist and had been through EMT
training, and that made Yolanda feel better about this arrangement.  








Yolanda testified that her work hours were 8:00
a.m. to 1:00 p.m. and that she would drop Alyssa and Jorden off at Stevens=s house around 7:15 a.m., take her son Branden and Stevens=s daughter Taylor to school, and then pick up her children from
Stevens=s house around 1:30 p.m. after she got off work.  

c.      Jorden Gets Injured on her First Day at
Stevens=s
House

 

On Yolanda=s first day of work, which was November 16, 1999, she picked up her
children at 6:30 p.m. because she had been at an all-day training.  When she picked up the children, she noticed
that Jorden=s elbow was
swollen and that she had a faint bruise across her head.  Stevens told Yolanda that the children were
outside playing on a toddler car and that Jorden had gotten pushed out.[4]  Yolanda thought that Stevens=s explanation seemed reasonable because Stevens had a cement patio in
part of her backyard.  Yolanda was upset,
however, at how Jorden looked and called Dr. Gibbs=s office and made an appointment for the next day. 

 

 








d.     Dr. Gibbs Refers Jorden to
Cook Children=s Hospital

The bruise on Jorden=s head had healed by the time she saw Dr. Gibbs the next day, but he
and Yolanda talked about the red spots on Jorden=s hands again.  Dr. Gibbs read
through his books to see if Jorden possibly had a bleeding problem like Yolanda=s grandmother, and he decided to refer Jorden to an oncologist at Cook
Children=s Hospital.  

e.      Examination at Cook Children=s
Hospital Reveals No Disease

 

Yolanda took Jorden to Cook Children=s Hospital on December 7, 1999. 
There, a bleeding time test, a complete blood count, and a physical exam
were performed.  Yolanda said that she
told the doctor that she was concerned because Jorden kept getting bruises.[5]  The doctor said that he would repeat the
diagnostic tests in three months, but that there was nothing medically wrong
with Jorden at that time.

f.      Christmas in Indiana Was
Bruise-Free








To celebrate Christmas, the Saager family drove
to Lloyd=s father=s house in
Indiana and stayed there approximately one week.  Yolanda and Lloyd noted that during that
time, Jorden had no bruising or health issues, though she did slip on the ice
and re-injure the finger that Alyssa had accidentally slammed in a drawer prior
to the trip.[6]

g.     New Year=s Eve at Stevens=s House

On New Year=s Eve, beginning at around 9 p.m., Stevens kept the Saager
children.  Lloyd admitted that he had a
few drinks with Ward that night.  During
that evening, Yolanda and Lloyd had Aa spat,@ so Yolanda
went to bed, and Lloyd went to Stevens=s house to pick up the children at around 3 or 4 a.m.  He noted that Stevens=s ex-husband was there. 

h.     Days Preceding Death

The next morning, the spat was over, and nothing
abnormal occurred on Saturday, January 1, 2000. 
On January 2, 2000, the Saager family watched movies and played.  Stevens did not keep the Saager children
on January 2.  








On January 3, Lloyd left for work between 5:30
and 6:30 a.m., Yolanda left for work around 7:15 a.m., and all the children
went to Stevens=s
house.  Yolanda testified that when she
arrived at Stevens=s house
after work to pick up her kids, there was a note on the screen door saying that
they had gone to the zoo.  Yolanda went
to the zoo, found the kids near the entrance, and saw that Jorden had a small
purple bruise under her eye.  Stevens
said that Jorden had been playing on the teeter-totter, that Alyssa had gotten
up too quickly, and that the teeter-totter had hit Jorden in the eye.  Stevens also told Yolanda that Jorden had
stuck her hand in a birdcage and had gotten pecked.  Yolanda was concerned about rabies, so they
talked to the curator, who said to treat the circular mark like a cut.[7]








After they left the zoo, Yolanda took the kids to
Ward=s house, got her checkbook, and took the kids with her to Plano so
that she could sign the rental papers for a town home that they were planning
to move into and to move in a load of their belongings.  Yolanda said that the kids ran around the
town home[8]
and that Branden stepped on Jorden=s finger and injured it a third time. 
 When they arrived back at Ward=s house, Yolanda fed the kids a quick dinner of peanut butter and
jelly sandwiches.  Lloyd arrived home
between 7:30 and 8:00 p.m. as the kids were eating.  Lloyd saw that Jorden was in her high chair
and heard her yell, ADaddy!@ as usual.  When Lloyd got
closer to Jorden, he could see what looked like eyeliner on her eyes.  Lloyd asked what was wrong with Jorden=s eye, and Yolanda said that it was a bruise from getting hit with the
teeter totter.  








Lloyd and Yolanda had planned to pack up Lloyd=s truck to take another load of their belongings to the town home in
Plano; they all went to Wal-Mart to purchase a tarp to cover the items that
they were moving.  After they finished
loading the truck, Jorden said that her tummy was hurting, and Yolanda noticed
that Jorden=s stomach
looked bloated.  Lloyd and Yolanda
thought that the milk Jorden had drunk with her sandwich had given her gas
because Lloyd is allergic to milk.  So
Lloyd laid Jorden on the bed; rubbed her stomach with soft, slow, deliberate
strokes; and tried to work her legs to help her expel the gas.  Yolanda said that she was present and that
Lloyd was not rubbing Jorden=s stomach forcefully, but that he did not have any luck in relieving
Jorden=s discomfort.  

Yolanda and Lloyd decided that it was too late to
make another trip to  to Plano. They put
Alyssa and Brandon to bed, and Yolanda tried to rock Jorden to sleep.  Yolanda could not get Jorden to sleep, so she
simply put Jorden to bed, and Jorden slept through the night.  

i.      Day Of Death

When Jorden woke up the next morning, January 4,
she said that her tummy was hurting. 
Before Lloyd left for work, Yolanda made Jorden eggs and toast so that
Jorden would not have to eat cereal with milk, the suspected culprit of Jorden=s stomachache.  Jorden only ate
a bite or two.  When Yolanda took the
kids to Stevens=s house and
dropped them off, she told Stevens that Jorden=s stomach was upset and that Jorden should ingest only Sprite and
crackers.  








While Yolanda was at work, she did not receive
any updates from Stevens regarding Jorden=s condition.  After Yolanda got
off work, Tracy Lester, the office manager at the doctor=s office where Yolanda worked, answered a call from a lady who said
that she babysat Yolanda=s children
but would not leave her name.[9]  Lester told the caller that Yolanda had just
left for the day.  The caller said that
she did not want to leave a message. 
When Lester asked again if she could get the caller=s name, the caller hung up. 
Lester testified that the caller did not seem worried. 

Meanwhile, Yolanda went home to use the restroom
before she picked up her children, and while she was at home, the Gainesville
Hospital called and told her to come immediately.  Yolanda said that she went to the emergency
room, that a doctor came into Jorden=s room and closed the door, and that the doctor then told her that
Jorden had died.  Yolanda got on her
knees and cried.  Around the same time, Lloyd was on a break at work and received a
call from a nurse at Dr. Gibbs=s office.  The nurse told him
that his daughter had fallen on the playground at Burger King, that she was on
her way to the emergency room, and that he needed to go to the hospital in
Gainesville.  Lloyd got in his truck and
left.  








While he was driving, his head was reeling, so he
called his dad in Indianapolis.  Lloyd
realized that he had failed to ask the nurse which of his daughters had
fallen.  Lloyd=s dad told him to stop his truck and to call the highway patrol for an
escort because he did not need to be driving while he was so frantic and also
to call the emergency room.  

Lloyd skipped the call to the highway patrol but
called the emergency room.  Dr. Gibbs,
who was at the hospital emergency room, got on the phone and told Lloyd that
Jorden had passed away twenty minutes earlier. 
Lloyd screamed and yelled at the doctor and then called his dad, who
said that he would be on his way. 

When Lloyd arrived at the emergency room, Stevens
came over with a glass of water, and he sat down.  He could not control his breathing, was
hyperventilating, and went into shock. 
Lloyd saw Jorden for a little while and noticed her bluish coloring. 

Lloyd and Yolanda did not obtain any information
from Stevens at the hospital. 
Consequently, they believed that Jorden had been misdiagnosed by the
medical professionals and that she must have died from a blood disorder. 

Later that day, Lloyd and Yolanda went to talk to
CPS.  CPS decided to take the Saagers= other two children for emergency protection. 








When Lloyd and Yolanda got home, Yolanda went
into their house, and Lloyd went over to Stevens=s house to find out what had happened. 
Stevens told Lloyd that she had taken the kids to Burger King and that
Jorden was not feeling well.  Stevens
said that she decided to take the children home and that, when Jorden climbed
out of the car, she fell on her Burger King cup.  Lloyd talked to Stevens for about an hour
before Yolanda came over.  While Lloyd
and Yolanda were at Stevens=s house, Stevens reached into her dryer and pulled out some of Jorden=s clothes,[10]
which the Saagers eventually gave to the authorities. 

j.      Day After Death

The next day, January 5, Lloyd and Yolanda made
phone calls to see if the autopsy was done because CPS had told them that if
the autopsy revealed that Jorden had died of some rare disease, then they could
have their children back.  However, they
learned that day that Jorden had not died from some undiagnosed blood disease;
the authorities had ruled Jorden=s death a homicide.  Lloyd said
that he was horrified when he heard the results.  








Thereafter, police detectives asked the Saagers
to come to the police station.  The
Saagers talked to the detectives for several hours, during which time the
detectives accused Lloyd and Yolanda of hurting Jorden.  The detectives also accused Yolanda of
covering up for Lloyd.  However, Lloyd
and Yolanda both said that there was no time on January 3 or January 4 when
either Lloyd or Ward were at home alone with Jorden.  Yolanda said that her children are very
important to her and that she had no concerns that Lloyd or Ward had anything
to do with Jorden=s death;
Lloyd said that he did not believe that Yolanda or Ward caused Jorden=s death.  Lloyd did not complete
his statement to police that day because his father caught him on a smoke break
and told him not to go back in and talk to the police because he had hired a
lawyer.  Lloyd said that he was fearful
of what would be inferred if he hired a lawyer, but he followed his dad=s instructions. 

Lloyd testified that he was never arrested or
placed in custody for Jorden=s death.  Lloyd also
testified that he did not have anything to do with Jorden=s death. 

k.      The Years After Jorden=s Death

Despite the fact that prior to January 4, 2000,
Lloyd and Yolanda had never been investigated by CPS,[11]
it took fifteen months for the Saagers to get Alyssa and Branden back after
Jorden=s death.  When Alyssa and
Branden were returned to Lloyd and Yolanda, they put Alyssa and Branden in
counseling with Dr. Dayna Fuchs.  The kids stayed in
counseling approximately one year, and during that time, Yolanda and Lloyd also
met with Dr. Fuchs.  








During
the three years that Jorden=s case was
pending,[12]
Yolanda, with Lloyd=s support, went to the FBI in Sherman and
tried to get the FBI to investigate Jorden=s death; she was
told that the matter was outside the FBI=s
jurisdiction.  Lloyd and Yolanda
contacted their state representatives in Fort Worth, they picketed with AJustice for Jorden@ posters outside
the courthouse, they called the detectives every week for a year and a half,
and they did research at Southwestern University to try to figure out what had
happened to Jorden.  Despite the Saagers= best efforts, it
took a long time for the story of Jorden=s death to be
pieced together; many people knew only portions of the big story.

2.       Facts Concerning the Medical Events of
Jorden=s Death

a.      Rachel Moore, LVN








Rachel Moore, who worked at Dr. Gibbs=s office, testified that on January 4, 2000, she saw Jorden with
Stevens at about 1:30 p.m.  Stevens had
Jorden in her arms, approached the front desk, and asked for Jorden to be seen
right away.  Moore described the way
Stevens was carrying Jorden as Alike a sack of potatoes.@  Moore said that Jorden was
limp and that her head bounced with every step that Stevens took.  Moore thought that Stevens should have
cradled Jorden; based on what Moore saw, she did not believe that Jorden could
have walked into the office on her own. 
Moore initially gave Stevens a clipboard to sign in on but then told her
to go back immediately to the surgery room. 

A few seconds later, Moore met Stevens in the
surgery room and had Jorden lie on a chair. 
Moore saw that Jorden did not look good and called out for someone to
dial 911.  Moore checked for Jorden=s pulse and respirations and asked Kathleen Cravens, a registered
nurse, to come help.  Moore testified
that Jorden had a greenish cast to her, that she was Adusky looking,@ and that
she had a small bruise on her forehead. 
Jorden was not breathing regularly, but Cravens was able to find a
pulse.  Moore and Cravens held an oxygen
mask in front of Jorden=s face
because she was tossing and turning. 
Jorden did not appear to be alert and was not responding to them
verbally. 

The EMS arrived promptly, and the nurses stepped
out of the room to allow EMS to take over. 
As the EMS were leaving with Jorden, Dr. Gibbs arrived back from lunch
and caught up with them.  

Moore felt that Jorden=s condition was so serious that she called Lloyd=s work number and asked his employer to locate him.  However, she was worried that he would not
arrive at the hospital before Jorden died. 









Moore testified that she interacted very little
with Stevens but that Stevens seemed anxious. 
Moore overheard Stevens say that Jorden had fallen down at Burger King
and that Stevens had left a note for Yolanda. 
Moore found out later that afternoon that Jorden had died, and she was
not surprised based on her observations at the clinic. 

b.     Janice Kathleen Cravens,
RN

Cravens testified that she works primarily with
Dr. McLeroy at McLeroy, Gibbs, & Klein Clinic, a family clinic.  On January 4, 2000, they had an emergency
situation at the clinic sometime between 1:00 and 1:30 p.m.  Moore, who was in the procedure room, yelled
for help, so Cravens joined her.  Cravens
testified that she saw a little girl lying on the table with bad colorCher hands were blue.  The girl
was Apretty limp@ and
appeared to be unconscious but was moving a bit.  Cravens=s first impression was that the little girl was in serious trouble; so
the second that she saw Jorden, she yelled, ACall 911,@ and the
office manager made the phone call.  








Cravens said that Jorden=s eyes were closed, so she did not check Jorden=s pupils.  Jorden did not
respond to her name or to touch and did not verbalize anything or even
cry.  Jorden had a bruise on her
forehead, her nose was a little bloody, and her abdomen was very
distended.  Cravens and Moore held an
oxygen mask to Jorden=s face
because she kept turning her head from side to side like she was aggravated by
it.  Dr. Gibbs was not there at that
time. 

Cravens testified that the EMS arrived very
quickly, looked at Jorden very briefly, and took her out to the ambulance in
their arms.  Dr. Gibbs arrived and went
to meet the EMS. 

Cravens talked to Stevens briefly and found out
that she was the babysitter.  Stevens
gave Cravens the impression that Jorden was ill because Stevens said that
Jorden had been vomiting, so Stevens had only given her Sprite and
crackers.  Cravens asked Stevens about
Jorden=s head and nose, and Stevens said that she was at Burger King and that
Jorden had gotten Awobbly@ and had fallen onto the sidewalk face forward.  Stevens said that she picked up Jorden and
brought her to the doctor=s office
straight from Burger King.  Cravens
included in her nurse=s statement,
which she made from the medical records, that Stevens had told her that Jorden
had played with other kids at Burger King and that she had started getting ill
on the way back to the car after playing. 








Cravens testified that the hospital was closer to
Burger King than the clinic and that, in retrospect, it struck her as odd that
Stevens brought Jorden to the clinic instead of the hospital; a child that
severely ill should have been taken straight to the emergency room.  Cravens knew within an hour of Jorden=s departure from the clinic that she had died; Cravens was not
surprised because she knew that Jorden was in serious trouble when she saw her.


c.      David Andrews, EMT

David Andrews, a licensed paramedic and EMT,
testified that he was dispatched at 1:36 p.m. on January 4, 2000, along with
three others, to an emergency at Dr. Gibbs=s clinic.  They arrived at 1:39
p.m. and found Jorden lying on a bed in one of the clinic rooms.  Jorden was unresponsive, her pupils were
fixed and dilated, her abdomen was distended and very rigid, and she was still
breathing on her own but only eight times a minute.  Andrews noticed bruising on Jorden=s forehead and face.  Andrews
picked up Jorden in his arms, ran to the ambulance with her, and attempted
several procedures there. 








Andrews tried to intubate Jorden, but her teeth
were clenched such that he could not get the tube down her throat.  Andrews attempted to start an IV line but was
unsuccessful.  They worked on Jorden for
a little while before Dr. Gibbs joined them and also attempted unsuccessfully
to intubate Jorden as they transported her to the hospital.  When they arrived at the hospital at 1:49
p.m., Andrews carried Jorden in to the emergency room doctors.  Afterwards, he sat and wrote his report. 

Stevens told him that the child=s mother had told her that morning that Jorden was spitting up and
instructed Stevens not to give Jorden any food, only something to drink.  Stevens said that she took the children to
Burger King to play and that she only gave Jorden a Coke.  Stevens stated that after they got home,
Jorden got out of the vehicle, took a few steps, and fell forward.  She said that she picked up Jorden and put
her in bed.  Later, she went to check on
Jorden and thought that she just did not look right, so she took her to Dr.
Gibbs=s office.  Stevens was not
emotional (i.e., she was not crying and did not appear upset) when he talked to
her; she was very straightforward with her story.  Andrews stated that even if Stevens had
received EMT training, which would help her remain calm in stressful
situations, he would have expected some type of distress from her because she
was Jorden=s babysitter
and would have some type of intimate relationship with the child. 








Andrews was still at the hospital when the
doctors pronounced Jorden dead.  The news
of her death did not surprise him because of the way Jorden had presented; her
heart had basically stopped when he carried her into the hospital, and her injuries
were incompatible with life.  He noted
that a lot of people who sustain traumatic injuries have clenched teeth in
response to the injury.  He stated that
Jorden=s fixed and dilated pupils indicated that she had suffered a serious
injury, as did her rigid, distended abdomen. 
Andrews said that he did not know what had caused Jorden=s death. 

d.     Dr. Mark Gibbs, Family
Doctor

After lunch on January 4, 2000, Dr. Gibbs arrived
at his clinic to find an emergency; an ambulance was in the carport, which was
not a common occurrence.  He found Jorden
in the ambulance and noticed that she was blue, was not breathing, was bruised
from head to toe, and was physically traumatized.  He found a little bit of a french fry in the
corner of her cheek when he was trying to intubate her.  He was unable to intubate Jorden because of
the movement of the ambulance; she was Abagged@ with an
ambu bag during the ride to the hospital. 
Jorden died within a few minutes of arriving at the hospital. 








Dr. Gibbs talked to Stevens when he walked
through the clinic on his way to the ambulance. 
He said that she was evasive and that he did not really understand her
story because she gave two different accounts in the sixty seconds that he
talked to her.  Stevens told Dr. Gibbs
that the children were at Burger King and that Jorden had fallen.  Dr. Gibbs asked Stevens if Jorden had come to
the clinic immediately after the fall, and Stevens said no.  Stevens then said that she had taken the
children home and that Jorden had fallen on the sidewalk.  Dr. Gibbs asked whether Jorden had fallen at
Burger King or on the sidewalk, and Stevens replied that Jorden had fallen on
the sidewalk.  Dr. Gibbs testified that
he thought it was odd that Stevens did not have an exact record of an event
that had just happened moments beforehand that involved a significant
injury.  He described Stevens as nervous
and said that Jorden=s injuries
and condition were not consistent with a fall. 


Dr. Gibbs said that Yolanda was an emotional
wreck when she learned of Jorden=s death.  Dr. Gibbs stated that
Lloyd called in while he was driving to the hospital and wailed like Dr. Gibbs
had never heard before when he gave Lloyd the news of Jorden=s death. 

Dr. Gibbs testified that on the day that Jorden
died, none of the medical professionals knew for sure what had killed her.  He said that he did not hear anyone at the
hospital say that Jorden had died of a ruptured spleen or a head injury or that
she had been hit with a broomstick. 

e.      Dr. Benjamin Respess, ER
doctor








Dr. Respess testified that he was an emergency
room physician on January 4, 2000, and that the emergency room received a call
that an ambulance was bringing in a critically ill child from Dr. McLeroy=s office.  Dr. Gibbs brought the
child through the emergency room door at 1:51 p.m., and she was clinically dead
when she arrived.  Immediately after
Jorden arrived, the emergency room staff examined her and noted that she had
breath sounds, that her abdomen was distended, that she had pulseless
electrical activity (i.e., there was electrical activity in her heart, but it
was not producing anything) which dropped within a minute to no cardiac output
of any type, and that she had bruising on her face, forehead, and abdomen.  They started CPR and called anesthesia, which
got her intubated.  They also put two
large bore IVs in her and went through the Pediatric Advanced Life Support protocol,
giving her medications to restart her cardiovascular system.  They worked on Jorden for eighteen minutes
before pronouncing her dead at 2:09 p.m. 








Dr. Respess testified that they noticed a lot of
things about Jorden as they were working on her, but they did not have a lot of
information about what might have happened to cause the tragedy.  For instance, when they put a nasogastric
tube down her nose to her stomach to try to get out the air that was caused by
her being bagged with oxygen on the way to the hospital, they got nothing,
which told them that her abdomen was not distended due to air.  He said that someone pointed out that Jorden=s rectum was dilated.  Dr.
Respess testified that the rectum can become dilated after any central nervous
system trauma or with cardiovascular collapse and that he did not have any
concerns that Jorden had been sexually assaulted because the rectal dilatation
looked like the product of injury and the dying process. 








Dr. Respess described photos of Jorden that were
admitted into evidence.  He testified
that Jorden had bruises on non-weight bearing areas, such as her medial right
thigh, which is an area where the child would not bruise if she fell.  Consequently, he said that he felt there was
a force applied to that area to cause the injury.  He said that Jorden had bruising on her
abdomen and that the blue lines were engorged veins on the abdominal wall.  He also noted a handprint bruise on Jorden=s back, a bruise on the back of her scalp, a bruise under the hair on
her forehead, injuries on her eyelids and on the right side of her face, and
two separate abrasions on her head, one of which was buried in her hair.  Dr. Respess questioned the parents about
family medical history and learned that they had a history of blood dyscrasia
(easy bruising).  However, he also
remembered hearing that Jorden and her family had gone on vacation, that the
bruising had gotten better, and that it reappeared when they returned from
vacation.  Dr. Respess testified that the
injuries he saw were not consistent with a child who had fallen face forward
and that the medical procedures performed on Jorden would not have caused the
abrasions to Jorden=s head, the
bruises to her body, or the distention of her abdomen.  

On the day of Jorden=s death, Dr. Respess did not hear any doctors or nurses say that
Jorden had died of a ruptured spleen or a concussion.  On January 4, 2000, he had no idea how Jorden
had died; he did not find out the cause of her death until the week before
trial. 

Dr. Respess said that in his twenty-seven or
twenty-eight years as an emergency room doctor, he has never had a patient
(other than Jorden) with a completely transected duodenum, which he said is a
tremendous injury.  He said that somebody
with that injury would not function for very long because just a pinhole in the
bowel would cause a person to get very sick within a few hours.  He stated that if a child is not acting
properly, she has probably been sick for longer than an adult because a child
has reserves of energy and will act through a lot of pain.  However, once a child begins to go downhill,
it is not unusual for her to crash quickly. 

f.      Audi Hayes, RN








Audi Hayes, a registered nurse who was employed
at Gainesville Memorial Hospital on January 4, 2000, testified that she first
saw Jorden as she was being brought in through the emergency room doors by the
ambulance crew.  Hayes echoed Dr. Respess=s testimony regarding the procedures that they performed on
Jorden.  Hayes noticed that there was
bruising on Jorden=s lower
back, extremities, and  around her
face.  Hayes said that Jorden=s rectum looked unusual because it was pushed out but testified that
she is not a sexual abuse nurse examiner and that the rectal distention could
be the result of the pressure in Jorden=s stomach. 

Hayes understood that Stevens was Jorden=s babysitter.  Hayes
specifically asked Stevens if Jorden had fallen, and Stevens said, ANo.@  Hayes remembered that, after Jorden died,
Yolanda held her for a long time and wailed. 
Although Stevens was sitting in the same room with Yolanda, Stevens  did not console Yolanda.  Hayes also remembered Yolanda=s saying that their family had gone on vacation and that Jorden had Agotten better,@ but when
they came back, the bruising started again. 
Hayes did not recall any discussion among the medical personnel
regarding Jorden=s having
been hit with a broomstick. 

3.     Facts Concerning the
Investigation After Jorden=s Death

a.      Alicia Burseron,
Gainesville PD








Alicia Burseron, who was employed by the
Gainesville Police Department in January 2000, received a call on January 4,
2000, to go to Gainesville Memorial Hospital emergency room to investigate a
possible assault on a child resulting in death. 
When Burseron arrived, she recognized Stevens from the day before.[13]  Burseron asked Stevens why she was there, and
Stevens said that she had brought in the child who was in the emergency room;
Burseron immediately connected Stevens to the child that she (Burseron) already
knew was deceased.  Burseron thought
Stevens=s demeanor was odd; Stevens did not act concerned or upset, as
Burseron would expect of someone who had brought a seriously injured child to
the emergency room.

Burseron went and saw Jorden, who looked
different than the day before.  Burseron
saw that Jorden was bruised all over and that her stomach was bloated.  Burseron was present when the parents said
their final goodbyes to Jorden and testified that both parents appeared
genuinely grief stricken. 








Burseron talked to Stevens again, after Stevens
was detained by police. Stevens said that she had met the Saagers at the end of
August 1999 and had started babysitting Jorden in November.  Stevens said that Jorden had been sick to her
stomach and sick in general ever since she met her.  On the day in question, Stevens said that she
had taken Jorden and her kids to Burger King and that they had played on the
playground.  Burseron wrote in her report
that Stevens told her that Jorden had not been feeling well all day and that
Stevens had been advised by Jorden=s mother not to feed Jorden anything to upset her stomach.  Stevens said that Jorden had one french fry
and some Sprite at Burger King.  Stevens
said that Jorden rubbed her eyes as if she were tired, so Stevens took the
children to her house to lay them down for a nap.  Stevens stated that when Jorden was walking
from the vehicle to the residence, she seemed very lethargic and fell face
down, dropping her drink.  Stevens said
that Jorden=s fall
occurred in the driveway and that the fall caused a laceration to Jorden=s lip.  When Stevens laid Jorden
down for a nap, she was crying from the fall and seemed uncomfortable.  Stevens told Burseron that she put Jorden=s arms over her chest and rocked her from side to side.  Stevens said that Jorden=s lips and eyes were swollen and that Jorden vomited numerous times. 








Stevens told Burseron that she left a note on the
door to tell Yolanda that they had gone to the park,[14]
but Burseron could not remember if Stevens told her why she left a note saying
that they were going to the park when in fact Stevens took Jorden to Dr. Gibbs=s office.  Stevens said that she
took Jorden to Dr. Gibbs=s office and
that, during the exam, Jorden=s lips turned blue.  Stevens
said that a nurse called for an ambulance to transport Jorden to the emergency
room, that Dr. Gibbs rode in the ambulance, and that she drove her vehicle to
the emergency room. 

b.     Bill Freeman, Former JP

Bill Freeman, who was formerly the justice of the
peace for Cooke County, received a call to go to the hospital on January 4,
2000, in response to an unnatural death. 
When he arrived, Jorden was on a stretcher in a trauma room and had
multiple bruises all over her body, including one in the middle of her back in
the shape of a handprint.  Freeman
learned that Stevens was Jorden=s caretaker, so he questioned her. 









Freeman noted that Stevens was not in any type of emotional distress
at the hospital and that her primary focus was explaining Jorden=s bruises.  Initially, Stevens
told him that Jorden had a blood disorderCdiagnosed at Cook Children=s HospitalCthat caused
her to bruise easily.  Stevens said that
Jorden had gotten out of the car with a Coke cup and was holding it with both
hands.  Stevens stated that Jorden
stumbled and fell forward.  She did not
try to catch herself, so she fell flat on her face.  Stevens said that after Jorden fell, she got
back up and walked into the house. 
Stevens told Freeman that she laid Jorden in bed with her and that she kept
rolling around and crying.  Stevens said
that she knew that Jorden was sick, so she took her to the doctor=s office.  Freeman said that
Stevens=s story might explain some of the bruises on Jorden=s face, but it did not explain the bruises elsewhere on Jorden=s body.                    c.      Ronnie Williams, Gainesville PD

Ronnie Williams, who worked for the Gainesville
Police Department in January 2000, assisted with the investigation of Jorden=s death.  He went to the
hospital to talk to Stevens.  They sat in
his car and talked, and as soon as they were finished talking, he wrote down
what Stevens had said.  During this first
interview, which occurred about 3:30 p.m., Stevens did not mention that Jorden
had suffered any type of fall. 








After interviewing Stevens, Williams and other
detectives went to Stevens=s house and entered with Stevens=s permission.  They took a
diaper and the note that Stevens had left on the door for Yolanda.  They took a Burger King cup[15]
with liquid in it and a white bowl with a food substance in it.  They noted that there were washed clothes in
the washing machine, but Stevens did not give them any clothing items.  

Around 5:55 p.m., the police took a more formal,
recorded statement from Stevens.  Stevens
said that Jorden was wearing a purple jogging suit, that Jorden had thrown up
on it, and that she had washed it. 
Stevens told the police that Jorden seemed tired and did not want to
play.  However, Stevens took her to
Burger King for lunch.  During this
interview, Stevens said that when they arrived home, Jorden exited the car,
took four or five steps, and fell.  After
Jorden fell, Stevens said that she put Jorden down for a nap and later took her
to the doctor. 

Stevens mentioned that the Saagers had been
investigated before by CPS.  Stevens said
that Yolanda had told her about the CPS investigation one night when she
brought Jorden over because she was sick. 
Yolanda told Stevens that Branden=s brain had swollen, that they had taken him to the hospital to
relieve the pressure, and that the hospital staff had initiated a call to
CPS.  Stevens said that she did not know
when the referral took place or whether the allegation was true, but she said
that was the only time that the Saagers had been investigated. 

d.       Dr. David Dolinak, Medical Examiner








Dr.
David Dolinak, a forensic pathologist, testified that he performed the autopsy
on Jorden on January 5, 2000.  He
described Jorden as a two-and-a-half-year-old female who was three feet tall
and weighed thirty-six poundsCa normally
developed, well-nourished toddler.  He
then proceeded to list Jorden=s injuries.

Dr.
Dolinak first mentioned the injuries that Jorden had on her extremities: a
one-and-a-half-inch bruise on her left elbow, a one-inch bruise and a
one-fourth-inch bruise on the back of her left forearm, and a three-fourth-inch
abrasion on her right elbow.  He said
that there were no injuries on Jorden=s legs.  








He
then described the injuries on her head: 
bruises in the inner parts of the eyelids of each eye, two small
hemorrhages in the right lower eyelid, a one-eighth-inch scrape at the tip of
her nose, a one-fourth-inch scrape below her right nostril, a five-eighths-inch
bruise in the middle of her forehead, a one-and-one-fourth-inch abrasion on the
left upper forehead involving the hairline, a two- or three-inch area of
bleeding or bruising underneath the forehead, a one-fourth-inch bruise to the
side of her right eyebrow, a three-fourth-inch bruise on the left side of the
head, a seven-eighths-inch bruise above the left ear, a three-fourth-inch
bruise toward the back of the left upper region of the scalp, a one-inch
abrasion near the middle of the back of the scalp, underneath which was a
two-inch area of contusion in the scalp tissue, and a one-and-three-fourth-inch
bruise in the right back of the scalp that had about a two-inch area of
underlying bruise associated with it.  

Jorden
also had a skull fracture that was four to five inches long on the back left
part of her skull.  Dr. Dolinak
considered this to be a significant fracture that would immediately have
affected Jorden, causing her significant pain and resulting in her reacting Apretty noticeably.@  Because Dr. Dolinak did not see any healing
attempts of the bone and because there was only a little inflammation in the
tissue, he opined that the fracture was fairly recent.  He said that he would have expected to see
evidence of some brain injury, like bleeding beyond the surface of the brain
and brain swelling, but he did not see anything like that.  He explained the absence by stating that it
was either an anomaly or that death had ensued soon after the fracture, causing
the body not to have time for the brain to swell or for bleeding to occur. 








Jorden
had three bruises that lined up next to each other in the central part of her
lower back, and those bruises comprised a one-and-three-fourth-inch by
one-and-a-half-inch area.  Dr. Dolinak
testified that the bruises on Jorden=s back may have
resembled marks like fingers, but he could not say for sure that a hand had
caused them. 

With
regard to the bruises, Dr. Dolinak testified that some of the bruises looked
older than others, but all of the bruises were there when the child died.  He said that he ran iron stains, which showed
older injuries in the mesentery, in the fingerlike bruises on the back, and in
two of the bruises on the scalp.  Those
injuries were at least forty-eight hours old because it takes that long for an
injury to test positive for iron; however, once an iron stain is positive, the
iron can Ahang around for quite a while.@ 

Dr.
Dolinak testified that Jorden=s external
genitalia looked normally developed and that he did not see anything
unusual.  Although the autopsy picture
showed that her anus had lost its normal fold pattern, the autopsy report
stated that the anus appeared atraumatic. 
He said that he did not see anything that would make him concerned that
Jorden had been sexually abused. 








Jorden=s abdomen had a
half-inch bruise on the left side and a kind of squared-off-looking bruise in
the lower right abdomen near her belly button. 
Dr. Dolinak testified that if someone had stomped on Jorden=s abdomen with a
long heel, it might require less force to make this squarish imprint.  Jorden=s abdomen was
distended and larger than Dr. Dolinak expected. 
When he opened up Jorden=s abdomen, he
discovered that approximately half a liter of bowel contents had escaped from
her bowel and were in her abdominal cavity. 
Dr. Dolinak stated that the fibrinopurulent material that was found
around Jorden=s bowel takes approximately twenty-four
hours to form.  There were two tears in
the mesentery tissue around Jorden=s small bowel that
would not have been immediately debilitating but would have caused pain and
irritation.  He also said that Jorden=s duodenum had
been transected such that the two ends of her bowel were completely torn
apart.  Dr. Dolinak described this as a
major injury to the duodenum, which could cause death.  He said that it would take a severe impact
for the duodenum to be transected and that such an impact would cause the duodenum
to be sandwiched between whatever force was pressing down on the abdomen and
the bony vertebral column that the bowel passes over. 

After
discussing the above findings, Dr. Dolinak testified that the cause of Jorden=s death was shock
and sepsis as a result of the transection of her bowel and said that Jorden=s head injury
could have contributed to her death.  He
said that he did not find evidence of any disease or medical condition that
would have caused Jorden=s death. 









Dr.
Dolinak was unable to pinpoint the exact time that Jorden=s fatal injuries
were inflicted.  He said that it is often
difficult to determine the precise point in time when an injury has occurred in
a young child because of children=s more varied
reactions to injuries and pain.  He
stated that a person experiencing leakage of the small intestine might not have
symptoms right away because the contents of the small intestine have a more
neutral pH and are not as acidic as those in the large intestine.  He said that he would have expected Jorden to
complain of her head hurting, of her stomach hurting, and of being cold, from
sepsis and shock.  He stated that a child
could easily lose consciousness from a skull fracture and would have had a
headache, been groggy, looked dazed, and not been herself.  He said that Jorden probably would have had a
decreased appetite and eventually no appetite. 
But he opined that Jorden could have gotten over these initial symptoms
and continued to act like herself for some period of time. 








Dr.
Dolinak initially provided a time frame for Jorden=s fatal injuries
of twelve to eighteen hours before death. 
His autopsy notes indicate that his pathological findings were
consistent with a finding that injuries were inflicted on Jorden on the evening
of January 3, 2000.  His notes further
state that Ait is difficult to believe, but not
impossible, that Jorden may have been running around asymptomatic with those
injuries at the apartment showing; but most likely, those injuries were
inflicted after the showing.@[16]  He testified that he thought that Jorden
could have run up and down stairs after the duodenum had separated.  Dr. Dolinak=s notes from April
2000 also echo this theory that Jorden=s abdominal and
head injuries were likely inflicted the evening before the day that she died
based on the timing of her first complaints of head and abdominal pain.  He clarified by stating that he understood
that Jorden=s eyes were watery, that she had bluish
discoloration around her lips, and that the inside of her eyes were very red at
3:30 p.m. at the town home showing on January 3, 2000, which would indicate to
him that something had already happened to Jorden.  With regard to Jorden playing at Burger King,
Dr. Dolinak testified that he would have expected her to be sicker because she
died shortly thereafter and that it is possible that the fatal assault had not
yet occurred. 








He
ultimately testified that Jorden=s injury could
have been inflicted anywhere from less than eight hours to forty-eight hours before
her death.  Based on this time frame and
Jorden=s death at 2:09
p.m. on January 4, 2000, Dr. Dolinak concluded that the fatal injuries occurred
between 2:09 p.m. on January 2, 2000, and 6:09 a.m. on January 4, 2000.  Dr. Dolinak said that one reason that he had
expanded the estimated time frame was because Jorden=s duodenum may not
have completely separated at the time of the blow and because he had reviewed
literature on the subject and had discussions with surgeons. 

Dr.
Dolinak testified that Jorden had a non-accidental pattern of injuries and that
in his opinion, the injuries were inflicted intentionally or knowinglyCknowing that the
injuries were probably going to kill the child. 
He stated that a person stomping on Jorden=s abdomen could
have caused her small bowel to separate and that a person kicking Jorden in the
head could have caused the four- to five-inch fracture.  He further testified that he would not expect
to see all the injuries that Jorden had from a simple fall. 

e.      Dana Huckabee, CPS

Dana Huckabee testified that she was an
investigator with the CPS office in Gainesville in January 2000 and that
between 2:30 and 3:00 p.m. on January 4, 2000, she received a call from a
police detective requesting that she come to the emergency room.  Once she arrived, the police and justice of
the peace informed her that a child had died with suspicious injuries and that
the death was unexplained.  She saw
Jorden and noted her bruising.  








Huckabee stated that her primary role was to
determine the safety of the two other children in the Saager home.  Huckabee met with the Saager family later
that afternoon.  She noted that Yolanda
was particularly upset and distressed, that Lloyd seemed shocked and was trying
to console Yolanda, and that neither Yolanda nor Lloyd seemed to understand
what had happened to Jorden.  

Yolanda told Huckabee that in September 1999 they
started noticing Jorden=s health
problems, which consisted of petechiae on her hands, a cold, and an ear
infection.  Later, they noticed that
Jorden had started bruising.  Yolanda
mentioned that she caught Jorden putting her fingers down her throat on
occasion, but Jorden did not throw up.[17]  Yolanda told Huckabee that Jorden would cry about
going to Stevens=s house and
that she (Yolanda) felt like Jorden did not like to go there.[18]









Lloyd told Huckabee that sometimes he felt like
maybe he played too rough with the children.[19]  During her investigation, Huckabee determined
that Yolanda and Lloyd had no history with and had never been investigated by
CPS in Texas, Florida, Colorado, or anywhere else. 

Huckabee conducted informal interviews with
Branden and Alyssa, who were five and three years old, but did not obtain much
information because of their young ages. 
Because Huckabee was more concerned about what was going on in their
house, she did not ask Branden or Alyssa about what went on in their babysitter=s home.  








Although there was no indication that Branden and
Alyssa had been abused in any way,[20]
after a staff meeting with her supervisor, Huckabee decided to place Branden
and Alyssa in foster care as a result of Jorden=s unexplained death.  When
Huckabee told Yolanda and Lloyd that CPS was putting Branden and Alyssa in
foster care pending Jorden=s autopsy results, they responded appropriately and were supportive of
the children.  Branden and Alyssa stayed
in foster care for at least nine months before they were returned to their
parents.[21]


Huckabee talked to Stevens at her home on January
5, 2000.  Stevens told Huckabee that she
had started babysitting the Saager kids on December 3, 1999, and that she
babysat Branden a few times during the Christmas break and on New Year=s Eve.  Stevens said that she
had taken Jorden to the zoo with her on January 3, 2000, and that an African
crane had pecked Jorden on the hand. 

Stevens stated that Jorden had been sick
frequently, that she bruised easily and frequently, and that she threw up every
day.  Stevens said that the Saagers had
taken Jorden to Cook Children=s Hospital and that the tests revealed that Jorden was fine.  Huckabee noted that Stevens spent a lot of
time telling her about Jorden=s vomiting, which led Huckabee to believe that Jorden was very sickly.









Stevens said that Yolanda told her that Jorden=s lips and stomach were swollen the night before January 4, 2000.  On the morning of January 4, 2000, Yolanda
told Stevens that Jorden did not need to have citrus and that she could have
toast.  For lunch that day, Stevens said
that she, Jorden, Alyssa, and Matthew went to Burger King.  Jorden had a drink and tried to eat a french
fry, but Stevens would not let her because of Yolanda=s instructions.  

When they returned to Stevens=s home, Jorden took two or three steps and fell on her face.  Stevens said that she was worried that the
straw in Jorden=s drink had
gone down her throat, but Jorden got up on her own and appeared to be
okay.  Stevens put Jorden down for a nap;
but she was restless, and Stevens could not keep a blanket on her.  Jorden told her that she was cold.  Stevens said that it looked like Jorden was
looking through her and that at about 1:00 p.m., she decided to take Jorden to
Dr. Gibbs=s office. 

Stevens stated that Jorden was awake when they
arrived at Dr. Gibbs=s office and
that she carried her in, though she felt that Jorden could have walked on her
own.  She said that they went into an
exam room and that the nurse tried to put an oxygen mask on Jorden, but Jorden
was batting it away and saying, ANo, no.@ 








During Huckabee=s interview with Stevens=s children, Huckabee noted that there were things about them that
seemed odd.  She said that Taylor was a
little reserved but seemed happy and that Mason was difficult to engage as he
turned his rear end to her and looked through his legs.  Stevens=s children denied getting into trouble at home and did not want to
talk about it, which was a red flag for Huckabee. 

Huckabee subsequently learned that Stevens had
been untruthful, and CPS removed Stevens=s children from her care on January 11, 2000, even though no evidence
of physical abuse was discovered.[22]  Huckabee testified that Stevens did not
respond appropriately when she was asked to explain to her children what was
happening; ultimately the police escorted Stevens away. 

f.      Anthony Anderson, CPS








Anthony Anderson became involved with Stevens and
the Saagers in March 2000 after Huckabee transferred to another CPS office.  He stated that the purpose of his
investigation was to determine the safety or risk that existed to the two sets
of children who had been removed, Stevens=s children and the Saagers= children.  As part of his
investigation, he interviewed Dr. Gibbs, nurse Cravens, and another nurse from
the clinic and obtained statements from them.[23]  He also did a great deal of research on the
case before he contacted Stevens to arrange an interview with her.  He said that the first time that he talked
with Stevens on the phone, she said multiple things that he knew were
false.  He interviewed Stevens in person
on March 23, 2000, at her attorney=s office and was not permitted to record the interview, so he took
notes and made a report. 

At the in-person interview, Stevens told him that
Jorden=s condition on January 4, 2000, was nothing unusual other than a sour
stomach and that Jorden did not complain of feeling poorly.  Stevens said that Jorden threw up once
because of her sour stomach, so Stevens changed Jorden and washed her
clothes.  Anderson=s notes indicate that Stevens told him that she had changed Jorden=s diaper more than once because Jorden had more than one bowel
movement during the day.  Despite having
changed Jorden=s clothes
and diapersCexposing
Jorden=s abdomenCwhen
Anderson asked Stevens about Jorden=s bloated stomach, Stevens stated that she had not seen any bloating
or distention. 








Stevens said that she took the children to eat at
Burger King, but Jorden only ate a french fry. 
Jorden said that she wanted to go play with Alyssa, and thereafter
Jorden played in the balls and slid down the slide.  Stevens indicated that Jorden was walking
around and moving normally.  Stevens said
that after about thirty to forty-five minutes at Burger King, Jorden had rubbed
her eyes and acted tired, so Stevens took the children back to the house to
take a nap.  When they got home, Jorden
fell flat on her face between the carport and the driveway.  Stevens did not alter her story despite
having seen Jorden=s autopsy
photos. 

Anderson testified that he also interviewed the
Saagers.  He said that when he concluded
his investigation, he recommended that the Saager children be reunited with
their parents. 

g.     Cindy Stormer, Ad Litem








Cindy Stormer testified that before she became
the Cooke County District Attorney, she was in private practice and was
appointed attorney ad litem for Stevens=s children in the civil suit terminating Stevens=s parental rights.  Stormer
interviewed Stevens=s childrenCTaylor, Mason, and MatthewCand found that they were the most abnormally behaving children that
she had ever interviewed.  Stormer
described the children as Avery robot-like@ and said
that they appeared to be brainwashed because they kept repeating the same
phrases over and over again as if they had been coached. 

Stormer said that she took Stevens=s deposition on June 6, 2000, and that it lasted most of the day.  Stevens testified that she started caring for
Yolanda=s children on November 29, 1999, and that Jorden received a bruise on
that first day because she fell out of a toy car.  Stevens believed that Jorden was taken to Dr.
Gibbs the day after she started babysitting her; however, the medical records
indicated that Jorden was taken to Dr. Gibbs on November 17, 1999, not on
November 30, 1999.  Stevens said that
Jorden reinjured her finger when Alyssa slammed it in a drawer; Stevens was
evasive about how Jorden injured her finger the first time and why this was a
reinjury. 

Stevens admitted that sometimes Jorden did not
want to come to her house and would hold onto her mother.  Stevens also admitted that she had told
someone that the Saagers had a history with CPS in Florida, and she said that
she had obtained that information from Yolanda. 
Stevens said that she had told people that she was a pharmacy technician
but denied saying that she was a pharmacist. 








Stevens said that the only injury that Jorden had
when she arrived at her house on the morning of January 4, 2000, was a
contusion on the right side of her face, which Stevens thought Jorden had
received by falling in the snow when she was on an out-of-state trip.  Stevens stated that on January 4, 2000,
Jorden threw up several times and that she had thrown up every day that she had
babysat her.  She admitted changing
Jorden=s clothes and washing them because they had vomit on them. 

Stevens said that they went to Burger King and
that Jorden played, walked around, and appeared to be healthy and normal.  Stevens said that she assisted Jorden with
sliding by putting her at the top. 
Stevens said that at one point, Jorden was restless and sleepy, but she
still acted normally.  Stevens said that
when they got back from Burger King and were walking into the house, Jorden
fell on the concrete driveway but did not cry. 
Stevens said that event was her first cause for alarm.  








Stevens said that she went straight to Dr. Gibbs=s office from her home at about 1:00 p.m.  Stevens admitted that she lived closer to the
hospital than to Dr. Gibbs=s office.  Stevens also admitted
leaving a note on January 4 on the back door for Yolanda but stated that the
note said that they had gone to the doctor.[24]  When asked why she took Jorden to the doctor
instead of to the hospital, Stevens said that Ait was not so serious that I thought she needed hospital care.  I thought she needed to be seen by her
doctor.@  Stevens admitted that no one
else had access to Jorden between 7 a.m. when she was dropped off by Yolanda
and the time that she died. 

h.     Leslie Switzer, Social
Worker

Leslie Switzer, a clinical social worker,
counseled Stevens=s children,
Taylor and Mason, from May 2000 until January 2001.  Initially, the children were very guarded and
reserved and said that they could not talk about their previous home life or
they would get in trouble with their mother. 
The children also mentioned that they had secrets that they could not
talk about because they would get in trouble. 
Once the children were told that they did not have to see their mother
anymore, they began to make progress in their therapy and began to reveal their
secrets. 








Switzer testified that the children=s secrets had to do with a baby that had died.  She said that in January 2001, the children
talked about witnessing Stevens Astomp@ on a
child.  During play therapy, Taylor would
show scenarios where the mother would stomp on the baby and kick it in the
head, and then Taylor would say that this is what she had seen her mother
do.  Switzer stated that Taylor
demonstrated this with a doll.  Switzer
said that some of the other themes during play therapy involved a baby getting
sick with a babysitter and then getting better and a mother hurting kids and a
baby having to go to the hospital.  

Mason talked about his mother=s putting a child=s fingers through a fence at the zoo and an animal biting the
finger.  In contrast, Switzer=s progress notes state that in November 2000, Mason had volunteered
that he did not have any secrets and that his mother was never aggressive or
abusive to anyone. 

 

 

4.     The Testimony Of People Who Were Related To
Or Knew Of The Saagers And The Stevenses

 

a.      Jorden=s Brother

Branden
Saager, who was eleven at the time of trial, testified that he stayed with
Stevens less often than his sisters.  He
went to the zoo with Stevens, watched her stick Jorden=s finger in an
ostrich cage, and saw Jorden get bitten by the ostrich, which made her
cry.  

Branden
also recalled a time when Stevens grabbed Jorden, threw her on the bed, and
shut the door.  He heard a smack and then
heard Jorden scream.  He heard another
smack and more screaming, so he went outside and hid behind the house.  He did not tell his parents because he was
scared.

b.     Jorden=s Grandfather








Clyde Ward testified that when Yolanda and Lloyd
were discharged from  the military, he
invited them to come live with him.  Ward
said that he enjoyed having three children in his home, that Jorden was a good
baby who did not cry often, and that he only remembered her throwing up one
time. 

Ward did not hear Jorden screaming like she was
hurt on the night before or on the day of her death.  Ward said that he thought he had lunch
downtown with friends on January 3, 2000, but that he was home by 5:00 or 6:00
p.m.  He did not remember anything out of
the ordinary taking place on January 3, 2000. 

When he was asked about the day of Jorden=s death, Ward stated that Yolanda had a habit of giving all three
children a shower at the same time and that she always got Jorden out first
because she would put her diaper on her, bring her to the kitchen, put her in
the high chair, and get her started on breakfast.  Ward recalled that on the morning of January
4, 2000, Jorden offered him a bite of her cereal and that he took it.  Ward said that Jorden was wearing a diaper
and that he did not see any bruises on her. 








Ward spent the day in Dallas, and that evening,
he received a call from his son informing him that Yolanda and Lloyd were at
the police station.  He went to talk to
the police and was taken in a room with his son and questioned for about thirty
minutes.  Ward did not have any concerns
that Yolanda and Lloyd might have been involved in Jorden=s death; he told the police that if he thought that Yolanda or Lloyd
were connected in any way to Jorden=s death, he would have shot them with his .357. 

c.      Stevens=s Ex-Husband

John Stevens testified that he was married to Kim
Stevens from 1993 to 1999.  After their
divorce, he lived in Grapevine, and Stevens lived in Gainesville.  He said that he would spend his days off in
Gainesville playing with his children and would even spend the night in an
effort to keep an eye on them.  

He said that he spent December 31, 1999 through
January 1, 2000, ringing in the New Year at Stevens=s house with his kids.  He
stated that when he arrived around 11:00 or 11:30 p.m., he learned that Stevens
was babysitting the Saager kids and that all the kids were asleep.  During that evening, Jorden kept going back
and forth to the bathroom with Stevens; he was not sure if she was vomiting or
coughing or if she had a stomach virus. 
He said that Lloyd came to pick up his kids around 3 or 4 a.m. and that
he seemed intoxicated because he was speaking loudly.  However, he noted that Lloyd seemed happy to
see his kids and vice versa. 








The next time that John came to Gainesville was
when Stevens called and told him that Jorden had died.  Stevens said that Jorden=s father was in jail and that he was going to be released to attend
the funeral, which John thought was a little unusual.  Shortly thereafter, John realized that
Stevens was the only person who had told him that and that he had seen Jorden=s father, who was not in custody, at the courthouse during a CPS
hearing.  

John testified that Stevens told him that the
Saagers had a history with CPS.  However,
John never saw any bruising on the Saager children, never witnessed Stevens
abusing them, and never witnessed Stevens abusing his children.  He admitted that Stevens verbally abused him
and their children and that verbal abuse was Athe norm,@ though he
did not remember Stevens verbally abusing the Saager children. 

d.     Stevens=s Children

Mason Stevens, who was ten years old at the time
of the trial, testified that he had not seen AKim@ in a Avery long time@ and that
made him happy.  He remembered going to
the zoo.  He said that Kim told the
little girl to put her finger in the ostrich cage, that she did so, and that
the ostrich bit her.  He stated that Kim
told the little girl=s mom that
Jorden had put her finger in the cage, even though that was a lie. 








Taylor Stevens, who was eleven at the time of the
trial, testified that she was happy not to have seen her mother in a long
time.  Taylor said that she knows that
Jorden was two and that she died.  

Taylor said that while they were at the zoo in
Gainesville, her mother stuck Jorden=s hand in the ostrich cage and that the ostrich bit Jorden=s finger.  Taylor thought that
seemed like a mean thing, and that it was not funny or a joke; it upset
her.  

Taylor also testified that she saw her mother
step on Jorden=s stomach on
purpose while Jorden was watching television. 
Taylor said that she did not remember how Jorden reacted. 

e.      Robbie Manthei, Owner of
Stevens=s House

Robbie
Manthei testified that she rented a house in Gainesville to Stevens and her
three children.  She said that Stevens
told her that she was a pharmacist, but Robbie later learned that this was not
true. 

Robbie
was not aware that Stevens was babysitting other children until she got a call
from Stevens asking her to pick up Stevens=s children from
school because Stevens had to take a little girl that she was babysitting to
the hospital.  Robbie said that she
picked up two of Stevens=s children from school and that later that
day she picked up Stevens=s baby from Stevens.  








Stevens
eventually called Robbie and told her that the police were coming to look for
toxins in Stevens=s house and that she might want to come
over.  When Robbie arrived, Stevens was
in the front yard and told her that the baby had died.  Robbie had already heard that the baby was
dead because she had sent her husband to the hospital to tell Stevens to come
pick up her children, who were being unruly. 
Her husband had told her that he had seen Stevens in a police car at the
hospital.  

Stevens
told Robbie that the baby had been sexually abused.  Specifically, Stevens said that hospital
personnel had told her that Jorden had a concussion and a ruptured spleen,
rectum, and vagina.  Stevens said that the
dad or the grandfather had possibly committed the abuse with his penis or a
broomstick.  Stevens asked Robbie to call
her mother and not her husband because she did not want her children taken away
from her.  Stevens also told Robbie that
Jorden=s dad had hurt his
son and that CPS had removed the little boy. 


Stevens
said that she had taken Jorden to McDonald=s that afternoon,
that Jorden had fallen down, hit her head, and cut her lip.  Stevens said that after they returned to
Stevens=s house, Jorden
became sicker, so she took Jorden to the doctor=s office.  Stevens said that Jorden had walked into the
office and that Stevens had carried her own daughter in. 








After
Jorden=s death, Stevens
called Robbie twenty to thirty times and asked if she knew what was going on
and told her that Jorden=s family had asked her to come pick out
clothes for Jorden=s funeral. 
Robbie testified that she does not know the Saagers. 

 

5.     The Facts Concerning Stevens=s
Defense That Jorden=s Parents Committed The
Offense[25]

 

a.      Dr. Roberto Bayardo

Dr. Roberto Bayardo, the Chief Medical Examiner
for Travis County for twenty-seven years, testified that he was appointed by
the court as an expert for Stevens and that he normally testifies for the
State.  He said that he was able to form
a more precise estimate as to when Jorden suffered the abdominal injury and
skull fracture because he had more information than the Dallas County Medical
Examiner had available to him.[26]









Dr. Bayardo testified that it was his opinion
that the injury that caused Jorden=s skull fracture and the injury that caused her duodenum to split
occurred at the same time and that he believes those injuries were inflicted
the evening before Jorden died.  He said
that the duodenum transection was a clean cut injury with no evidence of
hanging tissues; thus, there was no indication that Jorden=s duodenum was hanging on by a thread and later ruptured.  Instead, he believes that the duodenum=s complete transection occurred at the time of the injury. 

He said that Jorden=s skull fracture did not happen on the day Jorden died.  He based this opinion on a photo of this
injury that showed blood in the bone; he said that if Jorden=s skull injury had occurred on the day that she died, then there Awould have been more fluid, [or it] would have easily washed out, [or]
broke[n] away.@  








Dr. Bayardo testified that a severed duodenum is
a tremendous injury, requiring a tremendous amount of force, and that it would
require more force than a stomp on the abdomen. 
He said that he would expect a lot of crying at the time of the injury
and that it would be hard to hide that kind of injury in a house of three
adults.  He explained that the bowel
would shut down several hours after the injury and that he assumed that this
case was an exception to that rule because Jorden had at least two bowel
movements on the day of her death.  Based
on the microscopic sections of Jorden=s intestines and the photos, he believed that the injury had occurred
eighteen to twenty-four hours before Jorden died.[27]  He said that he would not expect Jorden to be
acting normally twelve to eighteen hours after this injury was inflicted, but
he said that children are resilient and their responses to injuries are not
predictable. 








He told the jury that the photo of Jorden=s anus showed that it was very dilated and did not appear normal.  He said that there were changes on the
surrounding skin that should not have been there.  He explained that this type of dilation is
caused by something penetrating the rectum many times and for a prolonged
period of time.  He said that the vaginal
opening should be closed by its hymen and that in Jorden=s case, her hymen is Akind of shortened, thickened, and appears dilated,@ which could be a normal finding but in his view was quite suspicious
and needed to be investigated for any history of vaginal penetration.  During cross-examination, Dr. Bayardo
admitted that Jorden=s hymen was
intact and that he was aware of literature indicating that a thickening of the
hymen is normal.  Dr. Bayardo concluded
in his report that Jorden had been the victim of chronic sexual abuse. 








Later in his testimony, Dr. Bayardo testified
that there was only one explanation for a very dilated, very abnormal anus like
Jorden=sCthe
probability that the child had been sexually abused.  In his opinion, Jorden=s anus had scarring because of the dilation, but he did not include
this finding or opinion in his report. 
Dr. Bayardo admitted, however, that the medical literatureCwhich he admitted that he had not seen beforeCindicated scarring is a more important factor for a determination of
sexual abuse than dilation.  He stated
that he was not aware of how a medical professional should review a finding of
anal dilation until the prosecutor showed him the medical authorities.  He agreed that the medical literature says
that a medical professional should be very cautious of equating anal dilation
with sexual abuse because anal dilation may occur for many reasons.  Until he was shown the medical literature, he
was not aware that a correlation exists between a duodenal injury and anal
dilation.  He was aware of literature
that anal dilation is not by itself an indicator of sexual abuse, but he would
not change his handling of the case.  He
agreed that one of the books that he relied on said that anal changes could be
postmortem anal dilation, which could be mistaken for sexual abuse, and that
4.7% of 171 children referred for gastrointestinal complaints revealed anal or
perianal abnormalities.  He admitted that
he would not expect parents to regularly take their children to the doctor if
they were abusing them. 

 

 

b.     Dr. Michael Flynn

Dr.
Michael Flynn, a clinical psychologist, testified that he interviewed Stevens
and did some psychological testing on her in jail and that he reviewed the play
therapy that Switzer had performed with Taylor and Mason.  He testified that memory is not a reliable
measure of actual events because people=s memories of
events can be manipulated depending on how they are questioned.  He opined that all play therapy encourages
children to make up things to try to please the counselor and that
inside-oriented play therapy raises the rate of false memories to 50%.  He agreed however that Taylor=s memory of her
mother=s stomping on
Jorden=s stomach was
consistent with the injuries found after the assault, and that Switzer had
possessed no knowledge of how Jorden=s injury had
occurred until Taylor told her. 








Dr.
Flynn testified that Switzer=s reports
indicated that she was going to keep coming back and picking at the children=s secrets until
she found out what they were.  He noted
that once Switzer got the allegation, she dropped the children and quit their
therapy at the time when he believed that therapy should have just been
beginning.  He pointed out that there was
no evidence that Switzer considered any diagnosis other than post-traumatic
stress disorder.  He said that the
children=s symptoms noted
by Switzer were symptoms of nearly everythingCanxiety disorders,
depression, oppositional defiant disorder, ADHD, and post-traumatic stress
disorder. 

c.      Constance Miller, Zoo
Keeper

Constance
Miller, who was a zoo keeper at the Frank Buck Zoo in Gainesville in January
2000, testified that she assisted in treating the bite on Jorden=s finger from the
African Crowned Crane.  She said that two
women were with the child and that the smaller woman appeared to be in charge.[28]
Miller testified that the smaller woman was acting overly emotional and was on
the verge of hysterics, which was a gross overreaction.  Miller stated that the smaller woman was
belligerent and rude.  With regard to the
child, Miller said that she did not look scared but instead was very quiet and
solemn with sad eyes. 








d.     Dana Huckabee, CPS
Caseworker

Huckabee
testified that she remembered Lloyd saying that Jorden was their weird child
because she did not look like their immediate family and that there was a
family joke about it.[29]  She also remembered his saying that Jorden
looked like his sister.  Huckabee
testified that she did not take Lloyd=s statement as
anything negative because he said it at the hospital shortly after they found
out that Jorden had died.  

Huckabee
recalled that Taylor said on tape that they did not ever get in trouble at home
and that her older sister Jillian was not going to live with them because her
mother kept getting so mad. 

e.      Jillian Evans, Stevens=s Daughter








Jillian
Evans is Stevens=s eldest daughter who was twenty-one years
old at the time of the trial and who lived with Stevens from November to
December 1999.  She testified that she did
not ever see her mother abuse the Saager children in any way, that she did not
see any bruising on them, and that her mother appeared to take Apretty good careA of the Saager children
and of her own children.  Evans stated
that she never saw her mother take Jorden into a room and close the door.  She said that the Saager children came over
without their hair brushed, that she saw food in Jorden=s hair, and that
Yolanda was always trying to get her mother to babysit.  She testified that Jorden threw up frequently
and that she ate her own vomit.  Evans
admitted that her mother locked her out of the house at one point for a few
minutes after an argument about smoking, and her father drove to Gainesville to
pick her up. 

f.      Sandra Walker, Neighbor

Sandra Walker testified that she lived near the
Saagers and that she had heard a noise during the late hours on January 1,
2000.  She said that she saw a figure
banging on the doors or the windows of 1311 MagnoliaCWard=s houseCand that the figure wanted to get in or to get somebody out.  She said that she did not call the police. 

g.     Robert Harden, Security
Consultant








Robert Harden testified that he came to
Gainesville on January 5, 2000, to conduct an extensive interview with
Yolanda.  During the interview, which
took place the evening after Jorden had died, Yolanda told Harden that in
November 1999, she had picked up Jorden from Stevens=s house and that she Alooked like she=d gotten the
hell beat out of her@; so Yolanda
took Jorden to Dr. Gibbs immediately thereafter.  Yolanda told Harden that prior to November
1999, she had never seen bruises on Jorden and thought that Jorden was
developing a medical problem.  

Harden asked Yolanda if her husband could have
done the physical damage to Jorden and if he was actually alone with the
children long enough to do it, and she said, AYes.@  However, throughout the intensive
interrogation that lasted three to four hours, Yolanda never waivered in her
opinion that her husband had not hurt Jorden. 
Yolanda repeatedly explained that she would not protect Lloyd if he had
hurt Jorden. 

Harden testified that throughout the interview,
Yolanda alternated between extremely emotional and suddenly very normal.  He also commented that although Yolanda had
described herself as naïve or very trusting, he did not think that she appeared
that way. 

6.     State=s Rebuttal

a.      Robbie Manthei, Owner of
Stevens=s House








During
rebuttal, Robbie testified about Stevens=s children=s extremely unruly
behavior while they were at her house. 
Robbie said that Stevens=s children threw
potpourri all over the house, they chewed up crackers and spit them out, and
they raised up her shirt and called her a bitch.  Robbie testified that when she tried to
correct them, the little girl would pick up the sofa cushions, put them on top
of the little boy, lie on them, and say, ADon=t hit me.@  Robbie said that
the children cowered, acted scared and petrified, and would run and hide each
time she and her husband tried to correct them. 
When Mason licked a table in Robbie=s house, Robbie=s dad told
him that he was going to jerk his ears off, and the little boy went crazy. 

Robbie noticed that the little boy had a very big
red mark about two to three inches long on the back of his neck that looked
like a curling iron or rope burn.  Robbie
said that her brother, who is an EMT, saw the mark and said that it looked like
rope and that it was big and raw.  The
children said that they did not know how it happened, and Stevens said that she
did not notice it, which Robbie thought was odd because Ayou [would] have to notice it.@  The little boy also had a mark
on his forehead that looked like a rug burn, but the children did not remember
how that injury happened.  Robbie
admitted that the children had never been in her care before but said that they
had seen her before. 

b.     Ken Manthei, Owner of
Stevens=s House








Robbie=s husband Ken testified that he understood that Stevens was a licensed
pharmacist.[30]  He said that on January 4, 2000, he was
working in the yard when he noticed some children at his house that he did not
recognize.  He learned that they were
Stevens=s children.  He stated that his
wife came outside and got him several times, asking him to try to restore order
inside the house.  He went inside the
first time and told the children that there needed to be more order, and the
second time when he went inside, the little girl begged him not to hit her
brother, who was hidden underneath some couch cushions.  Ken testified that the little girl=s begging made him think that the children had been Awhaled upon@ at some
point.  When his wife came out a third
time to get his assistance with getting the children to behave, he decided to
go to the hospital to get Stevens; he did not feel it was his job to keep
children that were acting so badly. 

When he arrived at the hospital, he saw Stevens
in a police car, and she told him that the child she had been babysitting had
died.  He realized that Stevens had
bigger problems than he did and decided that he and Robbie  would keep Stevens=s children a little longer. 

c.      Gordon Saager, Lloyd=s Father








Gordon Saager, Lloyd=s father, testified that when Jorden was at his house at Christmas,
she was doing very well and was very happy. 
However, he said that Jorden may have slipped on the ice and reinjured
her finger while she was at his house. 

When Lloyd called him on January 4, 2000 to tell
him that something was wrong with one of the girls, Lloyd did not know which
daughter was hurt.  Gordon testified that
he got on a flight from Indianapolis within an hour and a half of Lloyd=s phone call.  

When he arrived, he and the rest of Yolanda=s family made the decision that Lloyd should hire an attorney.  They hired an attorney while Lloyd was in the
interrogation room.  

Gordon talked to Stevens at some point on January
4, 2000.  She told him that she had taken
the children to Burger King that day and that upon returning home, Jorden
tripped and fell on the sidewalk leading to her house.  Once inside, Jorden seemed tired, so Stevens
said that she put her down for a nap. 
Jorden became very restless and would not go to sleep.  Stevens said that after a little while, she
went to Jorden, sat her up, held her, and rubbed her back to settle her
down.  He remembered Stevens telling him
that Jorden was not acting normally, that her eyes did not seem to be focusing,
and that she seemed to be looking right through Stevens.  








At that point, Stevens told him that she began to
think that something might be wrong, though she did not think it was terribly
serious.  Stevens told him that she
debated whether to take Jorden to the doctor because she did not think that it
was necessary at that point.  Stevens
told him that because Yolanda was due to pick up Jorden in about an hour and a
half, Stevens thought that maybe she should let Yolanda take Jorden to the doctor
if Yolanda thought it was necessary. 
Stevens finally decided that if the doctor was not busy and could see
Jorden right away, she would take her; if he was busy, she planned to take
Jorden home and let Yolanda take her to the doctor.  

Stevens told Gordon that she carried Jorden into
the doctor=s office and
asked if they could see her.  Stevens
said that she was told that the doctor could see Jorden, so Stevens went
outside to get the other children. 
Stevens told Gordon that when she returned, the nurses were trying to
give Jorden oxygen, and Jorden was fighting them.  Stevens told him that the nurses called an
ambulance and took Jorden to the hospital. 


d.     Dr. Joseph Guileyardo,
Medical Examiner








Dr. Joseph Guileyardo was consulted in this case
to give a time frame for when Jorden=s  injuries occurred.  He testified that he had signed off on the
autopsy performed by Dr. Dolinak on Jorden. 
He stated that he had reviewed the autopsy report; the investigative
report from the medical examiner; all the autopsy photos; the police reports;
the police department=s
investigative file, including witness statements; the medical records; and
opinions from other experts and that he had ordered another set of microscopic
slides. 

Dr.
Guileyardo testified that he believes Jorden=s skull fracture
was inflicted very shortly before her death because there was no injury to the
brain itself and because the microscopic analysis showed only very early acute
inflammation at the site of the skull fracture. 
He said that some of the iron stains from Jorden=s head injuries
tested positive, meaning that blood had been there for a couple of days, but he
said that all of Jorden=s head injuries were more recent than a
couple of days.  He said that if there
were no bruises on Jorden when she was dropped off at the babysitter=s house, then Aobviously there
was some head trauma after the child was dropped off@; thus, he
believes that the skull fracture occurred on the day of Jorden=s death.  He told the jury that there was only one
injury on Jorden=s face that would be consistent with a
fall; a fall could not explain Jorden=s other
bruises.  








Dr.
Guileyardo testified that there was no objective evidence that Jorden was
sexually abused.  He did not see any
abnormalities indicating sexual abuse.  He testified that scientific literature has
documented that anal dilation occurs in children who have suffered intestinal
injuries. 

Dr. Guileyardo=s opinion with regard to the injury to Jorden=s duodenum is that a child who has had her intestines totally
transectedCincluding
the blood vessels, causing a large amount of bleedingCwould look very sick, would be very symptomatic, and would die very
quickly after this devastating injury. 
He does not believe that Jorden could have functioned in a seemingly
normal fashion for fourteen to thirty hours while suffering from a completely transected
duodenum.  The argument that Jorden
suffered a complete transection of the duodenum the evening before her death
does not make sense to him because he would not expect Jorden to look fairly
normal on the morning of her death. 








Dr. Guileyardo attempted to explain the apparent
inconsistencies between the timing of Jorden=s duodenum injury and Jorden=s physical appearance and activities. 
He explained that there was a severe inflammation all over the inside of
Jorden=s belly and that such swelling takes a significant amount of time to
develop.  Consequently, an argument could be
made that the severe duodenum injury must have happened after Jorden was
playing on the town home staircase in Plano because she would not have been
able to play on the staircase with this kind of severe injury.  He noted, however, that the people making
this argument (Stevens) also asserted that Jorden was capable of playing at
Burger King the next day at lunch; he cannot reconcile these two
timing-of-injury arguments.  In other words, if Jorden experienced a total duodenum transection the
evening of January 3 after returning from the Plano town home, she would not
have been physically capable of playing at Burger King the following day at
lunch.  Therefore, he believes that
initially there was a small perforation of Jordan=s intestine that allowed bacteria to leak out into Jorden=s belly and set up
the infection over hours and hours, and then there was a second set of
injuries, which actually tore the intestines totally apart; otherwise, there is
no way to reconcile the two separate issues.[31]  Consequently, he believes that the initial
injury occurred several hours up to a day or so before Jorden=s death.  








Dr.
Guileyardo stated that Jorden=s injury was not
an accidental injury because the duodenum cannot accidentally be severed, there
were injuries on more than one part of her body, and the injuries were not all
in the same direction.  He said that
there is no accident involving a single fall that would result in all these
different angles and injuries unless the child was rolled over by a car.  In this case, he testified that the injury
could have been inflicted with a foot or a hand. 

Dr.
Guileyardo believes that the transection occurred after Jorden was dropped off
at Stevens=s house, that it happened within a very
few hours before she died, and that there was a significant injury prior to
that.  He believes that Jorden=s abdomen was
infected the night before she died due to the amount of inflammation in her
abdomen and the fact that it would have taken several hours up to a day or so
for that to form.  There was evidence
that Jorden was cold the night before her death, and Dr. Guileyardo testified
that if she was hemorrhaging or losing blood, she could feel cold.  He said that if he assumed that Jorden looked
sick on the staircase in Plano, that would fit with what he saw in Jorden=s belly, that is,
severe and acute inflammation.  He said
that Jorden=s stomachache, bloating, and chills are
symptoms consistent with a bowel perforation that had occurred the day before
her death and had caused an infection in her abdomen.  Thus, he testified that, in his opinion, the
fatal injury occurred after Jorden was at Burger King and that she would have
gone into shock within minutes. 








C.      Analysis of the Evidence[32]

1.       The Court=s Charge

In
this case, the jury was charged as follows:

Now, if you find from the evidence
beyond a reasonable doubt that on or about January 4, 2000, in Cooke County,
Texas, the defendant, Kim Stevens, did knowingly cause the death of Jorden
Saager by (1) striking or squeezing Jorden Saager with the Defendant=s hand, or (2) striking Jorden
Saager with the Defendant=s foot, or by (3) striking Jorden
Saager with or against a blunt object, the exact nature of which is unknown to
the Grand Jurors, and you further find beyond a reasonable doubt that Jorden
Saager was an individual under six years of age, then you will find the
defendant guilty of capital murder. 

 

2.       Evidence Supporting Jury=s Finding of Guilt

We
first consider the evidence that supports the jury=s verdict. 

a.       Credibility Issues








On
the day of Jorden=s death, Stevens showed a lack of emotion,
in stark contrast to the overwhelming sorrow shown by both Yolanda and
Lloyd.  On that same day, StevensCa pharmacy
technician, not the licensed pharmacist that she had portrayed herself to beCtold people that
Jorden had died of a concussion and ruptured spleen, even though Jorden=s cause of death
had not yet been established by the medical professionals who had treated
Jorden.  After Jorden=s death, Stevens
told numerous people that Jorden was always sick and vomiting and that the
Saagers had been previously investigated by CPS, which the jury could infer was
an effort to shift suspicion to the Saagers. 
Also, Stevens left a note for Yolanda saying that she had taken the
children to the park, when in fact she had taken Jorden to Dr. Gibbs=s office.  Again, this evidence supports an inference
that Stevens was covering up Jorden=s injury.  Stevens provided different versions of the
events to different people regarding exactly where Jorden had fallen and at
what point Stevens had taken Jorden to the doctor.








The
jury also heard evidence that Stevens=s ex-husband
visited his children frequently to keep an eye on them in light of Stevens=s tendency to
emotionally abuse them.  Moreover, Stevens=s son Mason had
what appeared to be unexplained burns on his head and neck on the day of Jorden=s death, and both
Mason and Taylor behaved oddly at the Mantheis= house that
evening, begging adults not to hit them as part of any reprimand.  The ad litem and Switzer also testified that
Stevens=s children behaved
oddly during their interviews with them. 
Stevens told Robbie Manthei that she did not want CPS to take her
children; when CPS did take them, the CPS worker testified that Stevens acted
inappropriately.  Despite Stevens=s having told
Robbie about Jorden=s death, Stevens proceeded to call Robbie
thirty to forty times after Jorden=s death seeking
news about the Saagers, whom Robbie did not personally know.

b.       Time-of-Injury Issues

The
evidence demonstrated that Jorden started bruising after Stevens began
babysitting her and that Jordan=s bruising ceased
while she was in Indiana with family at Christmas; this evidence could indicate
that Stevens was the cause of Jorden=s bruising.  Medical experts ruled out an undiagnosed
blood disease or an accidental injury as a cause of Jorden=s death.  The evidence established that Lloyd and Ward
were never alone with Jorden, that the screaming and crying that would
accompany a blow forceful enough to transect a duodenum could not have been
hidden in a house with three adults, and that when Lloyd was called to the
hospital, he did not know which of his daughters was in the emergency room.








Additionally,
Stevens=s description of
Jorden=s fall did not
explain the various injuries that Jorden had over numerous parts of her body,
especially the fairly recent skull fracture that was four to five inches long
on the back left part of Jorden=s skull.  Also, one of the medical experts testified
that due to the minimal inflammation around Jorden=s skull, her death
must have occurred shortly after the skull injury was inflicted, which would
point to Stevens as the perpetrator of that injury.

With
regard to the duodenum injury, the discoloration around Jorden=s eyes and mouth
that was obvious in her physical appearance while at the town home in Plano on
the afternoon of January 3 would also seem to indicate that, despite Jorden=s active behavior,
Stevens had inflicted at least an initial injury to Jorden=s abdomen before
Yolanda had picked up Jorden that day. 
Stevens=s stories that Jorden became restless and
sleepy at Burger King, that she was cold during her nap, and that she looked
dazed after leaving Burger King fit with the medical testimony that these
symptoms would be present shortly after the complete transection of the
duodenum had occurred, and testimony revealed that Stevens had sole possession
of Jorden from approximately 7:30 that morning until her death that afternoon.








Moreover,
Stevens=s children
testified that they saw their mother Astomp on@ Jorden, and this
testimony correlated with medical testimony that Jorden=s duodenum had
been transected and that some of the markings on Jorden=s stomach
resembled a heel print.  Ultimately, Dr.
Guileyardo testified that the fatal injury occurred after Jorden was at Burger
King, which pinpointed Stevens as the person who inflicted Jorden=s fatal injury.

3.       Evidence Weighing Against Jury=s Finding of Guilt

We
next consider the evidence that Stevens claims supports her factual sufficiency
challengeCthat the jury was forced to choose between
Stevens and Jorden=s parents as the perpetrators because
there was no eyewitness testimony, no confession, no fingerprints, no DNA, no
blood stains, no motive, and no evidence of prior acts of violence by Stevens
against Jorden.

 

a.       Credibility Issues

Stevens=s daughter Jillian
and Stevens=s ex-husband both testified that they had
never seen Stevens physically abuse the Saager children.  Jillian further testified that the Saagers
often called upon her mother to babysit their children and that they arrived at
Stevens=s house looking
disheveled, thus implying that the Saagers did not take good care of their
children.  The evidence also revealed
that Lloyd and Yolanda had fought the evening of New Year=s Eve, but there
was no evidence indicating that they were still feuding on the day of Jorden=s death or that
Lloyd would have taken out his frustration with Yolanda on Jorden.








Some
of Stevens=s evidence honed in on the possibility
that Jorden had been sexually abused, which Stevens argues weighs against her
guilt because she is a female and could not have sexually assaulted Jorden;
however, the bulk of the medical experts concluded that Jorden had not been
sexually abused.  Additionally, although
Lloyd=s dad hired an
attorney for Lloyd and Yolanda testified that Lloyd was physically capable of
hurting Jorden, Yolanda and Ward both testified repeatedly that they did not
have any reason to suspect that Lloyd had caused Jorden=s death, and Lloyd
himself testified that he played no role in Jorden=s death.

Furthermore,
Stevens elicited testimony from a clinical psychologist that her children=s memories were
not accurate and that their therapy had created false memories.  But the jury was free to draw its own
conclusions for why Stevens=s children
testified at trial consistent with their prior stories about Stevens=s stomping on
Jorden and for why Stevens=s own children
testified that they were happy that they had not seen Stevens in a long
time.  See generally Jones v. State,
984 S.W.2d 254, 257 (Tex. Crim. App. 1998) (stating that jury, as sole judge of
credibility of witnesses, is free to believe or disbelieve all or any part of
witness=s testimony).

b.       Time-of-Injury Issues













Dr.
Dolinak, the medical examiner, and Dr. Bayardo, Stevens=s medical expert,
both opined that Jorden=s fatal injury occurred the evening before
her death.  They both based this
conclusion on evidence that Jorden was running up and down the stairs at the
Plano town home on the afternoon of January 3, that she began complaining of an
upset stomach and being cold that evening, and that she had a decreased
appetite on the following morning.  They
also noted that some of Jorden=s bruises were at
least forty-eight hours old.  Moreover,
they both believed that the complete transection of Jorden=s duodenum
occurred all at once because the injury appeared to be clean, with no evidence
of hanging tissues.  Because the
fibrinopurulent matter they saw in the abdominal cavity takes twenty-four hours
to form, they opined that the transection had to have occurred at least
twenty-four hours before Jorden=s death.  Stevens=s medical expert
also saw some evidence of blood in the skull bone, which led him to believe
that Jorden=s head injury did not occur on the date of
her death.  All of this medical testimony
opened the door for the jury to consider others in Jorden=s home as the
possible perpetrator of her life-threatening injuries, but this same medical
evidence was highly contested by the State=s rebuttal medical
expert who testified that Jorden could not have functioned at the level she did
on the day of her deathCsliding, throwing balls, playing with
childrenCif she had already
received the fatal duodenum-transection injury. 

Viewing all the evidence in a neutral light,
favoring neither party, and giving due deference to the fact-finder=s determinations, Aparticularly those determinations concerning the weight and
credibility of the evidence,@ we hold that the proof of Stevens=s guilt Ais [not] so
obviously weak as to undermine confidence in the jury=s determination,@ nor is it Agreatly outweighed by contrary proof.@  See Watson, 204
S.W.3d at 414; Drichas, 175 S.W.3d at 799; Johnson, 23 S.W.3d at
9, 11; see also Couchman v. State, 3 S.W.3d 155, 164 (Tex. App.CFort Worth 1999, pet. ref=d) (stating that appellant=s different versions of events is evidence of his consciousness of
guilt, and jury could have reasonably concluded that appellant changed his
stories because he had something to hide).  We
therefore hold that the evidence is factually sufficient to support Stevens=s conviction for
capital murder.  See Martinez v. State,
No. 04-01-00310-CR, 2002 WL 31760936, at *2 (Tex. App.CSan Antonio Dec.
11, 2002, pet. ref=d) (mem. op.) (not designated for
publication) (holding that there was factually sufficient evidence to support
jury verdict convicting defendant of capital murder of two-year-old child whom
he was left alone with).  We overrule
Stevens=s fourth point.








IV.  Testimony of Adult Witness by Two-Way
Closed-Circuit Television 

Did Not Violate
Confrontation Clause

 

As mentioned above, Clyde Ward was Jorden=s grandfather.  At the time of
the trial, he was seventy-five years old; was living in Castle Rock, Colorado;
and was suffering from heart problems. 
Ward=s
cardiologist wrote a letter to the trial court explaining that during the year
preceding the trial, Ward had been evaluated and hospitalized multiple times
for decompensated congestive heart failure, gastrointestinal bleeding, atrial
fibrillation, and vascular disease.  The
doctor stated that Ward=s health
status was Aactually
quite tenuous,@ that he had
a history of coronary artery disease, that he had undergone bypass surgery, and
that he was at high risk due to his atrial fibrillation and other
comorbidities.  The doctor was very
concerned that if Ward were required to testify in such an intense and stressful
trial, the experience would have negative ramifications on Ward=s health.  She explained that,
in her professional opinion, AMr. Ward could very well suffer from a health standpoint.@  She requested that, if at all
possible, he be excused for health reasons from participating in the
trial.  








Thereafter, the State proposed that Ward be
allowed to testify via closed circuit television.  Ward=s cardiologist wrote a second letter stating that she was comfortable,
from a health-risk standpoint, with Ward providing testimony via closed circuit
television from the county where she was treating him. 

During the trial, the trial court heard argument
regarding the AState=s Motion to Allow Witness Examination Through Closed Circuit
Television@ and
ultimately granted the State=s motion to present Ward=s testimony via closed circuit television.  Prior to Ward=s testimony, the State requested that the record reflect the following
details concerning the physical set-up of the closed-circuit equipment being
used to obtain Mr. Ward=s testimony:

[W]e have set up a system wherein there=s a
podium in the middle of the courtroom from which the attorneys can question the
witness.  There=s a
laptop computer set up that will allow [Stevens] and the defense attorney to
view the witness as well as a probably 20-some-odd-inch television screen that
will allow them to view the witness as well and the jury can view the
witness.  And the feed allows the
witness, based upon the way it=s set up, to be able to see
the person questioning him as well as the Defense counsel table.  And the person questioning him is not
blocking or impeding the witness=s view of the counsel table
where the Defense attorney Counsel and the Defense Attorney=s
assistant can be seen.

 

And
so that should allow for contemporaneous transmission and contemporaneous
cross-examination and should allow the Defendant to be able to see the witness
and the witness to be able to see the Defendant and the jury to be able to see
the cross-examination and the witness contemporaneous with it taking place. 

 








In her first point, Stevens contends that the
trial court erred by allowing Ward to testify by video remote.  The State responds that in light of Ward=s tenuous health status and the technology used by the State to ensure
that Stevens=s right of
confrontation was scrupulously honored, the trial court did not abuse its
discretion by permitting the use of closed-circuit television. 








The Sixth Amendment provides, in relevant part,
that A[i]n all criminal prosecutions, the accused shall enjoy the right . .
. to be confronted with the witnesses against him.@  U.S. Const. amend. VI. 
This right to confrontation was made applicable to the states by the Due
Process Clause of the Fourteenth Amendment. 
Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068
(1965).  AThe central concern of the Confrontation Clause is to ensure the
reliability of the evidence against a criminal defendant by subjecting it to
rigorous testing in the context of an adversary proceeding before the trier of
fact.@  Maryland v. Craig, 497
U.S. 836, 845, 110 S. Ct. 3157, 3163 (1990). 
The Confrontation Clause reflects a preference for face-to-face
confrontation at trial, but that preference must occasionally give way to
considerations of public policy and the necessities of the case.  Id. at 849, 110 S. Ct. at 3165.  The salutary effects of face-to-face
confrontation include (1) the giving of testimony under oath, (2) the
opportunity for cross-examination, (3) the ability of the fact-finder to
observe demeanor evidence, and (4) the reduced risk that a witness will
wrongfully implicate an innocent defendant when testifying in his
presence.  See id. at 845-46, 110
S. Ct. at 3163-64. 








The two-way closed circuit television procedure
utilized by the State to present Ward=s testimony preserved all of these characteristics of in-court
testimony:  Ward was sworn; he was
subject to full cross-examination; he testified in full view of the jury, trial
court, and defense counsel; and he gave this testimony under the eye of Stevens
herself.  Here, Ward=s tenuous health situationCdocumented by letters from his treating cardiologistCwas an exceptional circumstance that warranted permitting his
testimony by two-way closed circuit television. 
See United States v. Gigante, 166 F.3d 75, 81-82 (2nd Cir. 1999)
(holding that upon a finding of exceptional circumstances, such as when a
witness has a fatal illness and is part of the Federal Witness Protection
Program, a trial court may allow a witness to testify via two-way closed circuit
television when this furthers the interest of justice), cert. denied,
528 U.S. 1114 (2000).  And the set-up
that the State employed did not deprive Stevens of her Sixth Amendment right to
confront Ward.  See generally Marx v.
State, 987 S.W.2d 577, 580 (Tex. Crim. App.) (holding that trial court=s admission of two-way closed circuit television testimony from two
child witnesses did not violate Sixth Amendment), cert. denied, 528 U.S.
1034 (1999).

Therefore, we hold that the trial court did not
abuse its discretion by allowing Ward to testify via two-way closed circuit
television.  We overrule Stevens=s first point.

V.  Erroneous Admission of
Social Worker=s Testimony

In her second point, Stevens argues that the
trial court erred by allowing  social
worker Leslie Switzer to testify about statements made to her that did not fall
within the medical-diagnosis-or-treatment exception to the hearsay rule.  Switzer testified that during therapy Stevens=s daughter Taylor told her that she had seen her mother stomp on the
baby and kick her in the head.  Stevens
contends that because Taylor was approximately six years old when she made this
statement to Switzer, Taylor was too young to understand the need to be
truthful to Switzer, the healthcare professional who was providing a medical
diagnosis or treatment.[33]  








Rule 803(4) provides for the following to be
admitted into evidence as an exception to the hearsay rule:  AStatements made for purposes of medical diagnosis or treatment and
describing medical history, or past or present symptoms, pain, or sensations,
or the inception or general character of the cause or external source thereof
insofar as reasonably pertinent to diagnosis or treatment.@  Tex. R. Evid. 803(4). 
This hearsay exception is premised on the assumption that a patient
understands the importance of being truthful with medical personnel involved in
his care so as to insure a proper medical diagnosis and treatment.  Beheler v. State, 3 S.W.3d 182, 188
(Tex. App.CFort Worth
1999, pet. ref=d).  The two-part test for admitting hearsay
statements under the medical-diagnosis-or-treatment exception set forth in rule
803(4) is (1) the declarant must make the statements for the purpose of
receiving medical treatment, and (2) the content of the statement must be such
that it is reasonably relied on by a health care professional in treatment or
diagnosis.  See Jones v. State, 92
S.W.3d 619, 623 (Tex. App.CAustin 2002, no pet.).

In Beheler, this court held that








[w]here very young children are responsible for
relating information to their healthcare provider, the presumption of
reliability that forms the basis for this exception may break down if they do
not understand the importance of being truthful.  Nevertheless, there is no requirement that a
witness expressly state that the hearsay declarant recognized the need to be
truthful in her statements for the medical treatment exception to apply.  Instead, the reviewing court must look to the
record to see if it supports a conclusion that the young child understood why
she needed to be honest when speaking to the caregiver.

 

3 S.W.3d at 188-89.  Thus, when the medical-diagnosis-or-treatment
hearsay exception applies to statements by very young children, the first prong
of the admissibility testCthat the
declarant must make the statements for the purpose of receiving medical
treatmentCmay be
satisfied by a showing that the young child recognized the need to be truthful
in her statements to her caregiver.  See
id.








The record before us is devoid of any evidence
that Taylor understood why she was in therapy or that she needed to be truthful
in her statements to Switzer.  Neither
Taylor=s father nor Switzer indicated that they had discussed with Taylor the
purpose of her therapy or the need to be truthful; in fact, Switzer testified
that she does not stress truth as an issue but instead stresses safety because
she works under the assumption that what children tell her is the truth.  See Powell v. State, 88 S.W.3d 794,
800 (Tex. App.CEl Paso
2002, pet. stricken) (holding that it was abuse of discretion to admit
statements three year old made to therapist in absence of indicia of
reliability).  Thus, we hold that the
trial court abused its discretion and acted outside the zone of reasonable
disagreement by admitting Taylor=s hearsay statement to Switzer as within the
medical-diagnosis-or-treatment hearsay exception.[34]  See Wright v. State, 154 S.W.3d 235,
241 (Tex. App.CTexarkana
2005, pet. ref=d) (holding
that A[w]ithout anything to indicate that R.C. understood the purpose of the
interview, and that the importance of being truthful was so Smedley could
effectively assess or diagnose her, it was error to admit the videotaped
statements@); see
also Jones, 92 S.W.3d at 623-24; Moore v. State, 82 S.W.3d
399, 405 (Tex. App.CAustin 2002,
pet. ref=d); Reed v. State, No. 02-02-00055-CR, 2003 WL 1894581, at *3
(Tex. App.CFort Worth
Apr. 17, 2003, pet. ref=d) (op. on
reh=g) (not designated for publication); compare Green v. State,
191 S.W.3d 888, 896 (Tex. App.CHouston [14th Dist.] 2006, pet. ref=d) (holding child had sufficient appreciation for purpose of questions
leading to her statement).  








We will not reverse a trial court=s judgment based on the erroneous admission of evidence, however,
unless the error affects a substantial right. 
Tex. R. App. P. 44.2(b); Johnson
v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  Substantial rights are not affected by the
erroneous admission of evidence Aif the appellate court, after examining the record as a whole, has
fair assurance that the error did not influence the jury, or had but a slight
effect.@  Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002). 
Here, Taylor testified at trial. 
She testified:

Q.  I want
to ask you, Taylor, if you ever saw Kim being mean to Jorden in any other way?

 

A.  Yes.

 

Q.  Tell me
about that.

 

A.  Jorden
was watching TV and she stepped on her stomach for no reason.

 

Q.  For no
reason.  Do you remember seeing that?

A.  Uh-huh.

Q.  Okay. 
And was that at your house?

A.  Yes. 
In Gainesville.

Q.  And where was Jorden at?








A.  She was watching TV laying on the floor on
her back.

Because Taylor herself
testified that she saw Stevens step on Jorden=s stomach, fair assurance exists that the less powerful testimony,
cumulative testimony of Switzer concerning this fact when considered in
connection with the other evidence, did not influence the jury or had but
slight effect.  Oveal v. State,
164 S.W.3d 735, 746 (Tex. App.CHouston [14th  Dist.]
2005, pet. ref=d) (holding
that Aa reasonable evaluation of the record gives fair assurance that the
error did not influence the jury=s verdict or had but a slight effect on the outcome@ when the erroneously admitted evidence was cumulative of other
admitted evidence), cert. denied, 547 U.S. 1116 (2006); Liggens v.
State, 50 S.W.3d 657, 662 (Tex. App.CFort Worth 2001, pet. ref=d) (same).  We overrule Stevens=s second point.

 

 

VI.  No Violation of Stevens=s Due Process Rights








In her third point, Stevens complains that the
trial court violated her due process rights by excluding evidence vital to her
defense that someone elseCspecifically,
Jorden=s father or motherCinflicted Jorden=s fatal
injuries.  According to Stevens, the
trial court erroneously excluded testimony from six different witnesCYolanda, Lloyd, Jillian Evans, police officer Terry Jackson, Jodi
Eaton, and Twyla MosbeeCconcerning
domestic violence between Yolanda and Lloyd. 
The trial court repeatedly ruled that it would exclude all evidence of
prior domestic abuse between Yolanda and Lloyd absent evidence that at some
point Lloyd=s physical
conduct was directed at one of the children. 
The trial court admitted evidence, however, that Yolanda and Lloyd had an
argument on New Year=s Eve, a few
days before Jorden=s
death.  And the trial court permitted
Stevens to make a bill of exceptions concerning each of the six witnesses= testimony on the issue of prior fighting between Yolanda and Lloyd.








Stevens claims that the trial court=s exclusion of the domestic violence evidence constitutes an erroneous
evidentiary ruling that violated her due process rights by preventing her from
putting on a defense.  AErroneous evidentiary rulings rarely rise to the level of denying the
fundamental constitutional rights to present a meaningful defense.@  Potier v. State, 68
S.W.3d 657, 663 (Tex. Crim. App. 2002). 
There are two distinct scenarios, however, in which rulings excluding
evidence might rise to the level of a constitutional violation:  (1) a state evidentiary rule which categorically
and arbitrarily prohibits the defendant from offering otherwise relevant,
reliable evidence that is vital to her defense; and (2) a trial court=s clearly erroneous ruling excluding otherwise relevant, reliable
evidence which Aforms such a
vital portion of the case that exclusion effectively precludes the defendant
from presenting a defense.@  Id. at 659-62,
665.  In the first category, the
constitutional infirmity is in the arbitrary rule of evidence itself.  Wiley v. State, 74 S.W.3d 399, 405
(Tex. Crim. App.), cert. denied, 537 U.S. 949 (2002).  In the second category, the rule itself is
appropriate, but the trial court erroneously applies the rule to exclude
admissible evidence to such an extent that it effectively prevents the
defendant from presenting her defensive theory. 
Id.  In other words, the
erroneous ruling goes to the heart of the defense.  Id.








Here, Stevens does not complain that the
evidentiary rules at issue are arbitrary rules that discriminate against her
right to present a defense.  Rather,
Stevens argues that she should have been entitled to present evidence that
Lloyd, Jorden=s father,
was a physically violent person, reasoning that had jurors been permitted to
hear this evidence they might have entertained a reasonable doubt as to her
guilt.  Thus, she relies on the second
type of evidentiary ruling that could conceivably rise to a constitutional
violation:  a clearly erroneous ruling
that excludes admissible evidence and that effectively prevents the defendant
from presenting her defense. 
Consequently, we proceed to analyze the testimony presented in the bills
of exception to determine whether the trial court=s evidentiary rulings were clearly erroneous.

A. 
Yolanda=s and Lloyd=s testimony

Yolanda and Lloyd both testified at trial.  They both testified that they had an argument
on New Year=s Eve.  The trial court limited Stevens=s cross-examination of them both, however, concerning any prior
physical violence between them because the prior incidents did not involve any
physical altercations with the Saager children. 


In a bill of exception concerning Yolanda=s and Lloyd=s testimony
about prior physical violence between them, Stevens elicited testimony from
both Yolanda and Lloyd that several physical altercations occurred between them
while they were stationed at Fort Hood, prior to their move to Gainesville. 








A trial court has considerable discretion in
determining whether to exclude or admit evidence.  See Montgomery v. State, 810 S.W.2d
372, 379 (Tex. Crim. App. 1991) (op. on reh=g); Rogers v. State, 183 S.W.3d 853, 857 (Tex. App.CTyler 2005, no pet.).  Absent an
abuse of discretion, we will not disturb a trial court=s decision to admit or exclude evidence.  See 
Martin v. State, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).  Under this standard, we will uphold a trial
court=s evidentiary ruling so long as the ruling is within the Azone of reasonable disagreement.@  Id.

Here, absent evidence that the children became
involved in the physical disputes Yolanda and Lloyd previously had when they
were living at Fort Hood, we cannot hold that the trial court abused its
discretion by excluding this evidence.  See
Tex. R. Evid. 401, 402, 403; see
also Ellis v. State, 99 S.W.3d 783, 789 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d) (holding trial court did not abuse its discretion by excluding
evidence).

Finally, when the trial court limited her
cross-examination of Yolanda and of Lloyd, Stevens did not raise her due
process argument; consequently, this subpoint is not properly before us.  See Kesaria v. State, 148 S.W.3d 634,
642 (Tex. App.CHouston
[14th Dist.] 2004), aff=d, 189 S.W.3d 279 (Tex. Crim. App. 2006)
(citing Wright v. State, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000), cert.
denied, 531 U.S. 1128 (2001)).

B.     Jillian Evans








Jillian Evans is Stevens=s oldest daughter.  Evans
testified at trial and in a bill of exceptions. 
In the bill of exceptions, Stevens asked Evans four questions.  Evans said outside the presence of the jury
that one of the Saager children had told her that their parents fought all the
time.  Evans could not remember which of
the Saager children had made that statement. 
At the conclusion of her testimony, Stevens offered the testimony and
asked Athat it be introduced in front of the jury,@ and the trial court denied the request. 

Here, again, absent evidence that Yolanda and
Lloyd=s fighting involved some type of physical confrontation with the
children, we cannot hold that the trial court abused its discretion by
excluding this testimony by Evans.  See
Tex. R. Evid. 401, 402, 403; Montgomery,
810 S.W.2d at 379.  And Stevens did not
object to the exclusion of Evans=s testimony on due process grounds, so this subpoint is not properly
before us.  See Kesaria, 148
S.W.3d at 642.

C.     Jodi Eaton and Officer
Terry Jackson

Both Jodi Eaton and Officer Terry Jackson
testified only via a bill of exceptions. 
Outside the presence of the jury, Stevens questioned EatonCwho was a neighbor of the Saagers in GainesvilleCregarding whether she remembered telling a uniformed officer on
January 4, 2000, that she had heard arguing coming from the Saagers= house for approximately ten minutes on the previous night and that it
was so loud that she had contemplated calling the police.  Eaton responded that she did not recall
speaking to a uniformed officer or making this statement; she testified that
she thinks she would remember if she had talked to a police officer and had
made the indicated statement.  








Outside the presence of the jury, Stevens asked
Officer Terry Jackson about a statement that he had taken from Jodi Eaton on
January 4, 2000, indicating that she had heard an argument occurring on the
Saagers= porch the night before and that it had lasted for approximately ten
minutes.  Officer Jackson stated that he
remembered taking the statement.  He said
that he had borrowed a piece of paper from Eaton=s mother to take notes on and that he had prepared a report from those
notes immediately after he had left the scene. 
At the conclusion of Officer Jackson=s testimony, Stevens re-offered the testimony of Eaton and Officer
Jackson and stated that A[i]t=s very important to this case, this bit of information.@  The State argued that Officer
Jackson=s testimony was being used only to impeach Eaton.  Stevens replied that this was such important
testimony that her due process and due course of law rights would be violated
if she was not able to introduce it and that she would even be willing to
introduce it through Officer Jackson without Eaton being present if the trial
court would agree to that.  Thereafter,
the trial court ruled that the testimony from both Officer Jackson and Eaton
was inadmissible. 








But on cross-examination in front of the jury,
Stevens elicited testimony from both Yolanda and Lloyd that they had a fight on
New Year=s Eve.  The excluded evidence
did not add much, if anything, to Stevens=s defense and certainly did not prevent her from putting on a
defense.  Accordingly, we cannot agree
with Stevens that the exclusion of Officer Jackson=s and Eaton=s testimony
violated Stevens=s due
process rights to put on a defense.

D.     Twyla Molsbee

Twyla Molsbee testified only via a bill of
exceptions.  Outside the presence of the
jury, Stevens questioned Molsbee, who was a nurse and foster mother for the
Saager children for a short time, regarding a statement that she had provided
to Detective David Wisian.  In her
statement, Molsbee described rocking Alyssa one night and asking whether Alyssa
had ever been hit; Alyssa responded that she had not been hit but that her
daddy had hit Jorden when Jorden would cry and that her daddy had hit Branden
some.  At the conclusion of her bill of
exceptions concerning Molsbee, Stevens argued that Molsbee=s testimony was so important to her case that her due process rights
and her right to due course of law under the Texas and United States
Constitutions would be violated if she was unable to put such testimony into
evidence.  Stevens further requested that
the rules of evidence be suspended to allow Molsbee=s testimony to be admitted into evidence.  The trial court denied this request.








The statement that Stevens sought to admit was
clearly hearsay and did not meet any of the hearsay exceptions.  See Tex.
R. Evid. 802, 803.  Stevens relies
on Alonzo v. State, 67 S.W.3d 346 (Tex. App.CWaco 2001, pet. dism=d as improvidently granted), 158 S.W.3d 515 (Tex. Crim. App. 2005), to
support her argument that hearsay, which does not quite fit the hearsay
exceptions, should be nonetheless allowed: 
(1) if there is inherent trustworthiness of the hearsay; (2) if there is
corroborating evidence that the hearsay is truthful; (3) if the hearsay is
important to the determination of guilt/innocence; (4) if the State had an
opportunity to examine the declarant of the hearsay; and (5) if the State is
unable to demonstrate the unreliability of the hearsay.  Id. at 360.  In Alonzo, the court of appeals held
that the trial court erred by excluding evidence tending to show that the
murder was committed by someone other than the defendant.  Id. at 361.  However, the excluded evidence in Alonzo
included a videotaped statement by a person who claimed to have been an eyewitness
to the killing and said that someone other than the defendant committed the
crime as well as statements by four others corroborating and supporting the
alleged eyewitness=s story of
the murder.  Id. at 356.  








In the present case, the excluded hearsay
consisted of a statement by  then
three-year-old Alyssa that her dad hit her brother and sister sometimes.  This excluded evidence is not comparable to
the excluded eyewitness statement in Alonzo.  The exclusion of Alyssa=s statement to Molsbee did not prevent Stevens from putting on a
defense.  Lloyd admitted, and testified
in front of the jury, that he occasionally spanked the children as a form of
discipline.  Additionally, in Alonzo,
the trustworthiness of the videotaped statement by the eyewitness was evidenced
by the witness=s knowledge
of details of the murder that only an eyewitness would know.  Here, no such indicia of reliability exist
concerning Alyssa=s
statement.  She could have simply been
indicating that Lloyd spanked the children on occasion, which he admitted.  And finally, Stevens had the opportunity to
call Alyssa to testify about her recollection of her statement to Molsbee, but
Stevens did not call Alyssa to testify. 
For these reasons, we hold that the trial court=s exclusion of Molsbee=s testimony regarding Alyssa=s statements did not violate Stevens=s due process rights.  See
Hall v. State, No. 05-04-01313-CR, 2005 WL 1706304, at *3 (Tex. App.CDallas July 22, 2005, no pet.) (not designated for publication).

 

 

VII.  Conclusion








Having
overruled each of Stevens=s four points, we affirm the trial court=s judgment.

 

SUE WALKER

JUSTICE

 

PANEL F:  WALKER, J.; CAYCE, C.J.; and LIVINGSTON, J.

 

PUBLISH

 

DELIVERED:  August
23, 2007











[1]As set forth below, the exact time
that the fatal injury was inflicted is disputed according to the expert
testimony; it may have occurred up to forty-eight hours before Jorden=s death.  Consequently, the events in the days immediately
preceding Jorden=s death are relevant, and we detail
those events in our evidentiary review.





[2]Ward is Yolanda=s stepfather=s father. 





[3]Before
their move to Gainesville, the Saagers had only taken Jorden to the doctor for well-baby
exams.  





[4]Lloyd was on a business trip during
Yolanda=s first week of work.  When he returned, he saw that Jorden=s arm was swollen and became upset
because he did not understand how Jorden=s fall from a toy car could have caused such a significant
injury.  Lloyd asked his daughter Alyssa
about Jorden=s fall, and Alyssa said that she
did not see Jorden fall but that Stevens had told her about it. 





[5]Jorden did not get bruises every
day that she stayed with Stevens. 
Yolanda testified that if Jorden had come home with bruises every day,
she would not have let her stay with Stevens. 





[6]One time when
Yolanda went to pick up the kids from Stevens=s
house, Stevens told her that Alyssa had accidentally slammed one of Jorden=s
fingers in a drawer. 





[7]William Baker, Jr. testified that
on January 3, 2000, he was the curator of Frank Buck Zoo in Gainesville.  He said that two women with a child had asked
to speak to someone in charge because a young girl had placed her hand into the
East African Crowned Crane exhibit and had gotten pecked on the hand.  He said that the little girl walked up on her
own, that he inspected her hand, and that he saw a very minor surface
indentation but no bleeding.  He noted
that Jorden seemed quiet and subdued and that he did not notice anything
unusual about her.  He said that Stevens
was rude and belligerent and that Yolanda seemed very concerned about her child=s welfare.  He assured them that the animals were in good
health. 





[8]Diane
Rafear testified that she manages town homes in Plano and that Yolanda picked
up the keys to their town home on January 3, 2000.  Rafear noted that Yolanda=s
daughter had extremely red eyes and discoloration around her mouth that looked
blue.  Rafear, who used to work for
cardiologists, thought Jorden had a heart disease, but Yolanda told her that it
was due to allergies because they lived in an older home.  Rafear testified that Jorden looked normal,
other than the red eyes and blue mouth, and that she ran up and down the
carpeted stairs inside the town home with her siblings.  Rafear said that she commented about the
noise that the children were making. 





[9]The
State admitted phone records showing that on January 4, 2000, the doctor=s
office where Lester and Yolanda worked had received a phone call at 1:08 p.m.
from Stevens.  





[10]Yolanda testified that to her
knowledge, Stevens had never washed Jorden=s clothes before that day. 





[11]Alyssa had surgery in Georgia when
she was two or three months old because she had pyloric stenosis, but no CPS
organization investigated the Saagers based on that surgery. 





[12]The police arrested Stevens in 2003
for Jorden=s death. 





[13]Burseron testified that on January
3, 2000, she was looking for a particular house when she met Stevens.  Burseron spoke with Stevens, who told her
that she was new to the area.  Burseron
saw several children, including a two-year-old girl who was wearing a fireman=s hat and running around with a
diaper on.  Burseron did not notice any
bruises on the child and did not think that the child looked sickly. 





[14]Burseron later went to Stevens=s house and saw the note on the
back door.  The note, which was admitted
into evidence, read:  AWe are at the park.  At the latest we=ll meet you here after I pick up
Taylor and Mason.@ 





[15]Although the property sheet stated
that they took a Whataburger cup, this was clearly an error because the picture
of the evidence showed a Burger King cup. 
The property list also contained another error, listing the date as A4/3/00@ instead of A1/3/00.@ 





[16]The Aapartment showing@ referred to by Dr. Dolinak is the
January 3, 2000 town home rental meeting at which Diane Rafear was present.





[17]Stevens
told Yolanda that Jorden was throwing up all the time, but neither Lloyd nor
Yolanda saw any signs of that and thought Jorden was playing a game in which
she faked vomiting to make her siblings laugh. 





[18]Yolanda
testified that towards the end, Jorden said that she did not want to go to
Stevens=s
house and that Stevens was mean.  Yolanda
noted in retrospect that Jorden=s attitude began to
deteriorate and that she was not as happy anymore after Stevens became her
babysitter.





[19]Lloyd
admitted that he roughhoused with the children by having tickling wars with
them, but he said that he was never violent with them.  He also did not roughhouse with Jorden during
the period of time when she was bruising. 





[20]Dr. Respess evaluated both Branden
and Alyssa and found no problems. 





[21]As noted above, the parents
testified that they did not get their children back for fifteen months.  The discrepancy between that number and the
six-month period of foster care testified to by Huckabee may be attributed to
the fact that Branden and Alyssa stayed with Yolanda=s grandmother, rather than in a
foster home, for an unspecified amount of time while they were in CPS
custody.  However, the record does not
clearly explain this discrepancy.





[22]Long bone scans performed on the
Saager children and the Stevens children revealed no old injuries. 





[23]Anderson testified that prior to
his taking statements from these individuals, they had not been talked to by
law enforcement about the case. 





[24]As mentioned previously, the note
retrieved by police from Stevens=s door said that the children and Stevens were at the park.





[25]Although some of the testimony set
forth below may appear to be irrelevant, we include it nonetheless because
Stevens claims in a separate point that she was prohibited from presenting a
defense.





[26]He said that he reviewed the
autopsy report and attendant diagrams, autopsy photos, recuts of the tissue
slides, the investigative report from the medical examiner, records from
Gainesville Memorial Hospital from January 4, 2000, Dr. Dolinak=s notes, the hematology and
oncology report from Cook Children=s Hospital, and the indictment.  He said that he had not been provided the
police officers= reports, witness statements,
Stevens=s statements, records from Jorden=s primary care physician, or
information on what Stevens=s children or Jorden=s siblings had witnessed. 





[27]However, he admitted that the iron
stain for the duodenal injury was negative. 





[28]The record indicates that Stevens
was referred to as the smaller woman. 





[29]Lloyd
testified that they joked a lot in their family and that they used to call
Jorden by the nickname Alittle
ugly duckling.@ 





[30]During cross-examination, he saw
that Stevens=s rental application stated her
occupation as self-employed pet care provider and full-time homemaker and that
another document said that she was an EMT and medical aide. 





[31]Dr. Guileyardo admitted that there
was no evidence in the picture of the bowel to indicate that it had received an
earlier rupture causing a leak and that there was a later split.  He said that an actual transection could
explain the build-up of fibrinopurulous material, but then, in his opinion,
Jorden would not have survived as long as she did. 





[32]The fact-finder could draw some
inference from virtually every witness presented by both sides in this
case.  We focus our analysis on the most
key credibility and time-of-injury issues.





[33]Stevens also claims that Switzer=s testimony concerning this
statement by Taylor was inadmissible because Switzer was not a doctor or a
nurse, but was a licensed clinical social worker and because the statement was
not made for the purposes of medical diagnosis or treatment.  But, because we hold that the trial court
abused its discretion by admitting this statement in the absence of evidence
that six-year-old Taylor understood the need to be truthful with Switzer, we
need not address the other grounds upon which Stevens challenged the
admissibility of Switzer=s testimony concerning Taylor=s statement.  See Tex.
R. App. P. 47.1.





[34]We note that the State makes a
compelling argument that Taylor=s statement to Switzer is not hearsay at all under Texas
Rule of Evidence 801(e)(1)(B).  Because
we hold that even if Taylor=s statement was hearsay and if it was error for the trial
court to admit Taylor=s statement, any error was
harmless, we need not address the State=s argument further.  See
Tex. R. App. P. 47.1; Shuffield
v. State, 189 S.W.3d 782, 790 (Tex. Crim. App.) (concluding that any error
was harmless after assuming without deciding that certain testimony was
hearsay), cert. denied, 127 S. Ct. 664 (2006).